UNITED STATES, Appellee,

v.

Claude B. JOHNSON, Private, U. S. Army, Appellant.

No. 30,926.

CM 429456.

U. S. Court of Military Appeals.

May 31, 1977.

*Captain Sammy S. Knight* argued the cause for Appellant, Accused. With him on the brief were Colonel Alton H. Harvey and *Major Richard J. Goddard.*

*Captain Larry R. McDowell* argued the cause for Appellee, United States. With him on the brief were *Colonel Thomas H. Davis, Lieutenant Colonel Donald W. Hansen, Major John T. Sherwood, Jr., Major Michael B. Kennett,* Captain Gregory M. Van Doren, and *Captain Richard S. Kleager.*

## Opinion of the Court

PERRY, Judge:

The appellant was convicted of premeditated murder and of wrongfully possessing explosive material (a claymore mine) in violation of Articles 118 and 92, respectively, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 892. He was sentenced to a dishonorable discharge, confinement at hard labor for life, total forfeitures, and reduction to the lowest enlisted grade. The United States Army Court of Military Review has affirmed both the findings and the sentence. We granted review to consider several assignments of error asserted by the appellant. For resolution of the case we find it necessary to discuss three of the issues: first, the refusal of the military judge to receive as evidence a written statement allegedly made by another enlisted man admitting the homicide of which the appellant was convicted; second, the denial of a speedy trial; and third, the denial of speedy review. We have determined that the first stated error is meritorious. Accordingly, we reverse.

I

The record reveals that the victim, First Sergeant Martin, died at approximately 2:30 a. m. on May 11, 1972, of wounds suffered from the detonation of a claymore mine outside his hootch at Long Binh Post, Republic of Vietnam. The Government alleged and presented evidence which tended to support its theory that the appellant and a fellow enlisted man willfully caused the mine to detonate, thereby committing premeditated murder.[1]

The defense presented evidence which not only tended to exculpate the appellant, but which also supported a conclusion that a third person, Private Lawrence Tanner, actually was the first sergeant's murderer. Toward this latter objective, the appellant's defense counsel presented the testimony of Specialist Four Monroe to the effect that Tanner had taken apart two claymore mines near the orderly room on May 10, the day preceding the murder. On that occasion, the witness stated, Tanner had said he might "blow away" the latrine or the urinal and, afterward, had asked where the first sergeant slept. Additionally, Monroe noted that after the explosion Tanner just stood in the orderly room, while everyone else ran toward the area of the explosion. Monroe

---

1. The other enlisted man, PFC Dukes, was tried by general court-martial but was acquitted of the charged murder prior to the commencement of the appellant's trial.

testified that the next day he found a clacker (a device used to provide electricity to a claymore mine) in the orderly room. The defense also presented the testimony, via a stipulation with the trial counsel, of Specialist Moran, who apparently saw an altercation between Private Tanner and the first sergeant on May 10, during which Moran heard the first sergeant tell Tanner that he was going to send Tanner north (to the area of battle) and that Tanner would not come back.

The last witness called for the defense in this regard was Private Tanner himself. The first question asked of Tanner by the appellant's defense counsel was: "Private Tanner, did you kill First Sergeant Martin?" Private Tanner replied, "I refuse to testify on the grounds it may incriminate myself." Tanner did admit pleading guilty to possessing an explosive device in June 1972 at Long Binh Post, but again interpleaded the Fifth Amendment in lieu of answering whether he was in the orderly room just prior to the first sergeant's murder on May 11. Tanner conceded that he was putting together an explosive device on May 10 just outside of the orderly room.

The defense thereupon attempted to introduce into evidence a written confession of Tanner to the first sergeant's murder. During an out-of-court hearing called by the military judge, Tanner was shown a copy of the confession and he acknowledged that the signature thereon was his and that the confession itself was written in his own handwriting. When the appellant's counsel requested that the confession be marked appropriately as a defense exhibit, the military judge remarked, "Well it will not be received in evidence, that's for sure."[2] Appellant's counsel then asked to call as a witness Sergeant Duane J. Koscinski, one of the witnesses to Tanner's execution of the confession. However, the military judge ruled that the witness would not be called unless Tanner admitted in open court that he committed the crime and confessed thereto without "standing on his rights against self-incrimination." The stated basis for this ruling was that such testimony, otherwise, would be inadmissible hearsay.

From the record, it is clear that the defense counsel was offering into evidence not only the handwritten confession of Tanner, but also an attachment thereto signed by Sergeant Koscinski detailing the circumstances surrounding the confession, as well as a letter of the same date as the confession from Tanner to the appellant. The substance of the confession, Koscinski's attachment, and the letter to the appellant follow:

> I, Lawrence R. Tanner: Being of sound mind and body do wish to confess to the murder of 1 Sgt. Martian [sic] on 11 May 1972. On 10 May 1972 I was CQ runner. I had made a bomb to get him but I was seen making the bomb so I did it with 1 M18 Calymore [sic] Mine and a spoon & blasting cap from a frag. I set it up outside Tops [sic] room at about 0250 11 May. I fixed it so the pin on the frag spoon was almost out, and tied about 75 ft. of string to the pin. I walked around the side of the warehouse so that I was behind Lucero who was on guard at the time but was asleep. I gave the string a good pull and it went off immideatly [sic] when I pulled. The delay fuse did not work it went off when I pulled the string. I ran to the orderly room and went in through the door on the side faceing [sic] the motor pool I rolled the string up and threw the pin across the road and put the string in the trash and went out the front door to see what happened.
>
> End of Statement
> /s/ Lawrence R. Tanner
>
> WITNESS
> /s/ Duane J. Koscinski
> On the above time and date [1925 hours, 9 October 1972], I Sgt Koscinski was placeing [sic] a light bulb above Prisoner Tanners [sic] cell when he called me over and said he wished to make a statement con-

2. At Dukes' trial, presided over by the same judge, Tanner's confession had been admitted into evidence.

cerning the murder of 1sg. Martin. I then proceeded to get the Duty Officer (1 Lt Sonberg). We then proceeded to maximum security Bldg # 2. I Sgt Koscinski then advised Prisoner Tanner of his rights under ART. 31. He then stated he understood them and wanted to get something off his chest. He then confessed to the murder of 1sg. Martin. The following cadre personel [sic] were present during the confession. 1 Lt Sonberg, Sgt. Koscinski, Sp/4 Hoenow, Sp/4 Pagel. Tanner then made a 2 page confession that goes with this D.R.

/s/ Duane J. Koscinski

Bro Johnson

I just want to say I'm sorry about the time you spent in jail over this murder bit. But I want you to understand that I had to do it. The man said he was going to get me, that he would see me dead: so I had to do him in. It was me or him, and you know who's still hanging around. I could give a fuck what happens now. They just fucked with me so much and put so much wood on the ole fire that it just sort of cooked my brains. And now that I've got my brains scrambled real good I just don't care any more. Well here's to you, and all the high old times we've had.

Your ole Buddy

/s/ Tanner

■ The appellant has urged to this Court that the decision of the United States Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297

(1973), is controlling of the issue at bar, compelling a conclusion that the exclusion from the factfinders of evidence of Tanner's confession denied the appellant due process of law. U.S.Const. amend. V. It is a contention with which we are constrained to agree.[3]

A respected commentator, Charles Alan Wright, in a 1969 publication[4] observed:

The rule in all actions, civil and criminal, is that hearsay will not be received, but the rule is subject to numerous exceptions. In criminal cases, the Confrontation Clause [U.S.Const. amend. VI] provides an additional barrier against admission of hearsay offered on behalf of the prosecution. . . . If the evidence is offered on behalf of the accused, the matter is quite different, for then it is the hearsay rule alone, unsupported by any constitutional limitation, that calls for exclusion of the evidence, and the *Due Process Clause of the Fifth Amendment provides a basis for a claim that probative evidence tending to show the defendant to be not guilty cannot be excluded simply because it is hearsay.*

It was just such a claim that was presented a few years later to the United States Supreme Court in *Chambers v. Mississippi, supra.* In his trial for murder of a policeman, the defendant Chambers called as his witness a man named McDonald in order to introduce into evidence McDonald's written confession to the crime of which Chambers was accused. On the state's cross-examina-

---

3. While not possible in this case, in the future questions of admissibility of such evidence may be resolved by the trial judge on grounds short of constitutional dimension. While statement-against-penal-interest is not one of the "principal exceptions to the hearsay rule applicable in 'court-martial trials,'" paragraph 139c, Manual for Courts-Martial, United States, 1969 (Rev.), as those exceptions are discussed in paragraphs 140–46, MCM, it is an exception, applicable under certain circumstances, included in the Fed.R.Evid. 804(b)(3), effective July 1, 1975. So far as not otherwise prescribed in the Manual, "the rules of evidence generally recognized in the trial of criminal cases in the United States district courts . . . will be applied by courts-martial." Paragraph 137, MCM; *see*

*United States v. Weaver,* 23 U.S.C.M.A. 445, 450, 50 C.M.R. 464, 469, 1 M.J. 111, 116 (1975). Since the Manual purports only to list the "*principal* exceptions to the hearsay rule" (emphasis added), and does not, by definition, purport to limit the exceptions to those specified in paragraphs 140–46, rule 804(b)(3) is not incompatible with military practice as gleaned from the Manual, and, therefore, it is a fully applicable rule of evidence in courts-martial tried on or after July 1, 1975.

4. 2 Wright, Federal Practice and Procedure § 412 (1969) (emphasis added) (footnotes omitted), *citing Ferguson v. Georgia,* 365 U.S. 570, 602, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961) (Clark, J., concurring).

tion of McDonald, however, the witness recanted, repudiating his earlier out-of-court confession and urging a story in alibi. At this point the defendant's counsel moved to cross-examine McDonald as an adverse witness concerning the repudiation of the confession, the alibi, and other oral confessions purportedly made by McDonald to three other witnesses. The trial judge denied the motion on the ground that a Mississippi rule precluded a party from impeaching his own witness. Additionally, the judge did not permit the defendant to call to the witness stand the three people to whom the oral confessions had been made, ruling such testimony to be inadmissible hearsay evidence. In due course, Chambers was convicted of the murder, which conviction was affirmed through the Mississippi court system.

 The High Court, in an opinion by Mr. Justice Powell speaking for eight members of the Court, held that under the circumstances of that case the application of Mississippi's "voucher" rule foreclosing the defendant's cross-examination of McDonald who had first confessed and who then had repudiated his confession, and the application of evidentiary rules to forbid the introduction of the hearsay testimony of the other three witnesses as declarations against penal interest, violated the defendant's due process rights to a fair trial: the right to confront and to cross-examine adverse witnesses and the right to present witnesses in one's own behalf. The Court concluded that the cumulative effect[5] of the rulings required reversal of the murder conviction.

The Court first noted the general rule that hearsay evidence is recognized by virtually every jurisdiction in this country to be inadmissible as normally being untrustworthy.[6] However, the Court also marked the equally virtual unanimity of certain well-developed exceptions to that general rule where the hearsay statements were "made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination."[7] One such exception is the declaration against interest. But, as the Court pointed out, most jurisdictions—including Mississippi—limit this exception to declarations against *pecuniary* interest. While recognizing the jurisdictions that have struck this materialistic limitation and have extended the exception to declarations against *penal* interest as well, and while noting the "scholarly criticism"[8] of the pecuniary restriction, the Court declined to hold outright that *all* declarations against penal interest must be admitted to meet due process standards. What it *did* decide was that declarations against penal interest by third parties, when "originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability,"[9] are admissible, the absence of an evidentiary rule to that effect notwithstanding. *Trustworthiness* of such a declaration, then, rather than a flat evidentiary rule, is the measure.

 In the case at bar, in the words of the Supreme Court, the evidence "rejected by the trial court here bore persuasive assurances of trustworthiness."[10] Tanner himself initiated the conversation with Sergeant Koscinski in which he volunteered a statement regarding the first sergeant's murder; Tanner was fully advised of his rights under Article 31, UCMJ, 10 U.S.C.

---

5. While the Supreme Court addressed the cumulative effect of two erroneous evidentiary rulings, we believe the same result is mandated even though only one such misstep is present here. Where a third party's confession, initially given and subsequently offered under circumstances bespeaking reliability, is excluded from the factfinders' consideration, and where the evidence supporting the conviction is circumstantial, the trial hardly can be characterized as fair.

6. *Chambers v. Mississippi*, 410 U.S. 284, 298, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *see United States v. Wilson*, 1 M.J. 325, 327 (1976).

7. *Chambers v. Mississippi*, supra 410 U.S. at 299, 93 S.Ct. at 1047.

8. *Id.* at 300, 93 S.Ct. at 1048.

9. *Id.*

10. *Id.* at 302, 93 S.Ct. at 1049.

§ 831, which rights he freely waived; his confession, complete with details of the crime's commission, is logical and is not inconsistent in any respect with the other evidence adduced at trial; his letter to the appellant is replete with motive for murdering Martin; the confession undoubtedly is incriminatory and unquestionably against interest; the confession, as well as the letter to the appellant, are written in Tanner's own handwriting and signed by him; his declarations were made in the presence of four people apparently not associated in any way with Tanner, the appellant, or with the murder investigation; Tanner stood to benefit nothing from disclosing his culpability and he must have been aware of his liability to criminal prosecution resulting therefrom; the confession is corroborated by the testimony of Specialist Four Monroe and by the stipulated testimony of Specialist Moran, discussed earlier; if Tanner wished to renounce his confession or to reveal matters affecting its reliability or voluntariness, he was present in the courtroom and could have done so; and if the Government wished to "get behind" the facial reliability of the confession (as opposed to inquiring into matters surrounding the *crime*), Tanner was factually available in the courtroom to testify thereto and legally "available" via offering a testimonial grant of immunity, if necessary. We believe these to be circumstances and factors which emitted the "persuasive assurances of trustworthiness" which the Court found in *Chambers v. Mississippi, supra.*[11]

Mr. Justice Powell, speaking for the Court in *Chambers*,[12] observed:

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. Mr. Justice Black, writing for the Court in *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948), identified these rights as among the minimum essentials of a fair trial:
>
> > 'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.'
>
> See also *Morrissey v. Brewer*, 408 U.S. 471, 488–489, 92 S.Ct. 2593, 2603–2604, 33 L.Ed.2d 484 (1972); *Jenkins v. McKeithen*, 395 U.S. 411, 428–429, 89 S.Ct. 1843, 1852–1853, 23 L.Ed.2d 404 (1969); *Specht v. Patterson*, 386 U.S. 605, 610, 87 S.Ct. 1209, 1212, 18 L.Ed.2d 326 (1967).

When that fair opportunity is compromised by the unthinking and inflexible exclusion from evidence of matters which are relevant and trustworthy, the process to which the accused is subject is not that to which he is "due."[13] In sum:[14]

> In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

## II

As earlier indicated, the appellant was charged with offenses occurring on May 9 and 11, 1972. He was placed in pretrial confinement on May 12. Although the report of the Article 32[15] investigation was complete and forwarded on June 6, trial proper did not commence until October 9—a

---

11. Id.

12. Id. at 294–95, 93 S.Ct. at 1045.

13. There is no issue regarding the retroactive application of *Chambers*, for the Court expressly noted:

> In reaching this judgment, we establish no new principles of constitutional law.

*Id.* at 302, 93 S.Ct. at 1049.

14. *Id.*

15. Article 32, Uniform Code of Military Justice, 10 U.S.C. § 832.

period of 150 days after the date on which continuous confinement began. As such, the presumption of a denial of the appellant's right to a speedy trial guaranteed under Article 10[16] arises. *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971).

■ The Government urges that the delay in excess of the 90 days normally permitted it to try an accused[17] be excused herein "because of the highly unusual circumstances surrounding the prosecution of the instant court-martial." Citing this Court's opinion in *United States v. Marshall*, 22 U.S.C.M.A. 431, 434, 47 C.M.R. 409, 412 (1973), the Government contends that some of these "unusual circumstances" justifying the exceptional delay in this case were the "very serious offenses,"[18] the complex nature of the investigation and prosecution, the foreign situs of the crimes and the trial, and the combat environment in which the appellant's unit was engaged and in which the appellant was tried. The Government does not contend, however, that any of these "unusual circumstances" *contributed to or caused* the delay. In the absence of such a causal nexus between the proffered factual circumstances and the delay, the former will not justify the latter. *United States v. Henderson*, 1 M.J. 421, 423–424 (1976).

Finally, the Government argues that the prosecution's desire to try the companion case of Dukes first, with an eye toward then using Dukes' testimony against the appellant at the latter's trial, qualified as a bona fide extraordinary reason for the unusual delay. Under the facts of this case, we hold that it is.

On August 14, counsel, for both sides met with the trial judge at an Article 39(a)[19] session for the purpose of setting a trial date. At that time, the Government requested that a date subsequent to Dukes' trial date be set in order that the Government could get a more substantial case against the appellant. It was the Government's intent to try Dukes first and then to use Dukes' testimony against the appellant. The military judge acquiesced in this request and set a date of September 5, immediately after Dukes' trial apparently was planned to conclude.

■ However, on September 5, the trial counsel requested an additional continuance, again citing as the basis therefor the Government's desire to complete Dukes' trial. The trial judge granted the continuance and the appellant's trial commenced on October 9, at which Dukes did testify on behalf of the prosecution. We believe that a delay of this relatively short duration, taken for the purpose of obtaining the testimony of a witness legitimately perceived to be essential[20] to the successful prosecution of the prime wrongdoer, was permissible. *See United States v. Weisenmuller*, 17 U.S.C.M.A. 636, 640, 38 C.M.R. 434, 438 (1968); *see also Barker v. Wingo*, 407 U.S. 514, 534, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). It is, in short, a situation in which due care to the prosecution of this case required more than a normal time in marshaling the evidence.[21] *See United States v. Marshall, supra.*

---

16. Article 10, UCMJ, 10 U.S.C. § 810.

17. *United States v. Driver*, 23 U.S.C.M.A. 243, 49 C.M.R. 376 (1974).

18. This Court concluded in *United States v. Henderson*, 24 U.S.C.M.A. 259, 262, 51 C.M.R. 711, 714, 1 M.J. 421, 424 (1976), that the relative seriousness of the offense is not "a rational basis upon which to measure whether an extraordinary circumstance exists as to excuse departure from *Burton.*"

19. Article 39(a), UCMJ, 10 U.S.C. § 839(a).

20. *Cf. United States v. Simmons*, 22 U.S.C.M.A. 603, 48 C.M.R. 227 (1974), where this Court held that the Government had not met its *Burton* burden when "a great deal of the delay resulted from the Government's desire to dispose first of similar charges of perjury against another person whose testimony was *not* essential to the Government's case against the accused and who did *not* testify as a Government witness." [Emphasis added.]

21. It is heartening to see the practice develop where the trial counsel feels obliged, and the trial judge feels empowered, to have the Government offer its grounds for delay *before* the delay is taken, in the form of a motion for

### III

Finally, the appellant contends that he has been denied a speedy disposition of the appellate review of his case,[22] which delay constitutes a denial of his right to due process. Included in the appellant's broadside attack is not only the period of 163 days between the completion of the trial and the action of the convening authority, but also the period of 448 days between the date on which The Judge Advocate General appointed appellate defense counsel to represent the appellant and the date on which the appellant's brief and assignment of errors was filed before the Court of Military Review; the 3 months it took Government appellate counsel to file their brief in reply to the appellant's initial assignment of errors, as well as an intermediate assignment by civilian defense counsel; the 2 months between the filing of the reply brief and the oral argument had in the case before the Court of Military Review; and the nearly 7 months between the date of that hearing and the release by that court of its decision and opinion in the case.

■ This Court need not now concern itself with the alleged improper delays the case experienced once it was at issue before the Court of Military Review.[23] Neither

must we now judge the legal consequences of the unusual length of time expended by appellate defense counsel to review the case and to file the pleadings before that intermediate court.[24]

As to the delay at the convening authority level—the period between the completion of the trial and the action by the convening authority—this is a matter which has received considerable attention in this Court's precedent even before *Dunlap*. In *United States v. Jefferson*, 22 U.S.C.M.A. 554, 556, 48 C.M.R. 39, 41 (1973), we found a 244-day delay at that stage of the process to have been "unreasonable." "[D]eplorable and unreasonable" were the adjectives used to describe the 212-day delay in the convening authority's action in *United States v. Gray*, 22 U.S.C.M.A. 443, 445, 47 C.M.R. 484, 486 (1973). This Court held in *United States v. Timmons*, 22 U.S.C.M.A. 226, 227, 46 C.M.R. 226, 227 (1973), that a largely unexplained delay of 180 days between completion of the trial and the action by the convening authority on the 94-page record of trial and upon the advice contained in a short and uncomplicated staff judge advocate's review, was "unreasonable."

Even if the delay is unreasonable, depending upon the circumstances of a given

---

continuance, thereby involving judicial authority and judicial discretion properly at an early stage.

**22.** The presumption of a denial of speedy disposition, announced in *Dunlap v. Convening Authority*, 23 U.S.C.M.A. 135, 48 C.M.R. 751 (1974), is not a consideration in this case, as the trial occurred before the effective date of that pronouncement of July 21, 1974.

**23.** While an appellate court is not wholly unanswerable for seemingly inordinate periods of time utilized in disposing of a case before it, *see Higdon v. Bailey*, Misc. Docket No. 75–62, (C.M.A. Jan. 14, 1976), the interests involved at the appellate level and the very functions of appellate courts make a certain amount of delay "normal."

**24.** The appellant was represented before the Court of Military Review at different times by three separate appellate "action" counsel who, together, requested and were granted 14 consecutive 1-month enlargements of time within which to file assignments of errors and a brief in support thereof. A fourth counsel ultimately

argued appellant's cause before the Court of Military Review, as well as represented the appellant before this Court. An examination of the motions filed for these enlargements reflect that each counsel, in turn, believed that the issues involved in the case were complicated and required extensive research and writing, and, further, that each time one of the counsel appeared to be making some progress in moving the case to issue, he left active duty in the service, thereby necessitating a newly appointed counsel to begin the representation of the appellant. Unfortunately, each time a new counsel was appointed, the motions also indicate that in each instance it was many weeks before that new counsel even began review of the record of trial, much less researched and briefed these complicated legal issues. Put another way, the public record is replete with reflections not only of ill-considered case management and assignment at the attorney-supervisor level, but also of a lackadaisical approach by action counsel, neither of which may be tolerated in a first-rate criminal justice system.

case, the remedy, if any, afforded an appellant because of this unreasonable post-trial delay prior to the convening authority's action may vary. For instance, in *Timmons*, there existed in the case an error in the staff judge advocate's review which affected only the sentence of that accused. In light of the delay in the convening authority's action, this Court's majority determined that the remedy laid in a sentence reassessment by the Court of Military Review. To warrant a dismissal of the charges, however, which is requested by this appellant due to the alleged unreasonable post-trial delay, the circumstances must coincide with the standard enunciated in *Gray*: [25]

This Court has ruled that before ordering a dismissal of the charges because of post-trial delay there must be some error in the proceedings which requires that a rehearing be held and that because of the delay appellant would be either prejudiced in the presentation of his case at a rehearing or that no useful purpose would otherwise be served by continuing the proceedings. See *United States v. Timmons*, 22 U.S.C.M.A. 226, 46 C.M.R. 226 (1973), and cases cited therein.

As earlier discussed, there is in this case an error perceived in the proceedings which requires a rehearing, viz., exclusion from evidence of Tanner's confession. However, to make dismissal of the charges an appropriate and necessary remedy for the delay occasioned in the review of the trial, not only must the delay have been unreasonable, but also the appellant must somehow have been prejudiced in the presentation of his case at that rehearing and that prejudice must have been occasioned by the delay. We believe that the time and the place for the decision initially to be made regarding the unreasonableness of the delay and any claimed prejudice flowing therefrom are at the time of the rehearing in the trial forum. Only there is a full litigation of all aspects of this issue practical.

The decision of the Army Court of Military Review is reversed. The findings as to Charge I and its specification, and the sentence, are set aside. A rehearing thereon may be held.

Chief Judge FLETCHER concurs in parts I and III and concurs in the result in part II.

COOK, Judge (dissenting):

I have a number of reservations as to the correctness of certain statements in the principal opinion. Among them are the following: the implication that had defense witness Tanner's confession been admitted into evidence, he could still refuse to testify about its "facial reliability" on the ground of self-incrimination, see *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); the implication that there is a legal obligation on the part of the Government to grant immunity to a defense witness who refuses to testify on the ground of self-incrimination, see *United States v. Alessio*, 528 F.2d 1079 (9th Cir. 1976), cert. denied 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976); and the declaration that the trial forum, rather than this Court, is the appropriate place to assess the prejudicial effects of inordinate post-conviction delay, see *United States v. Burns*, 2 M.J. 78 (1976); *United States v. King*, 2 M.J. 4 (1976). I disagree specifically with the affirmance of Charge II. Independent of the evidence connected directly with the murder charge, the evidence of accused's guilt of unauthorized possession of a claymore mine, the subject of Charge II, is minimal. In my opinion, the evidence which we now hold should have been admitted because its probable impact upon the court members in regard to the findings of guilty as to Charge I also bears significantly upon Charge II. A reverse, but analogous, situation was before us in *United States v. Kalpakidis*, 1 M.J. 393, 394 (1976). There we noted that, although inadmissible testimony by a Government witness related only to one of two offenses, both offenses were "so

---

**25.** *United States v. Gray*, 22 U.S.C.M.A. 443, 445, 47 C.M.R. 484, 486 (1973).

interrelated as to be inseparable." *Id.* In consequence, we concluded that the testimony had "a material impact on the court members," not only as to the offense to which it directly related, but also as to the "interrelated offense." *Id.* I would, therefore, reverse the decision of the United States Army Court of Military Review in its entirety, set aside all the findings of guilty, and return the record of trial to a competent court-martial authority for a rehearing, if deemed practicable.