UNITED STATES, Appellee,

v.

Phillip H. PERNER, Corporal, U. S. Marine Corps, Appellant.

No. 41,201.

NCM 79-1812.

U. S. Court of Military Appeals.

Oct. 12, 1982.

For Appellant: Captain William J. Ciaravino, USMC (argued); Lieutenant Henry J. Howard, JAGC, USNR (on brief).

For Appellee: Major Charles Wm. Dorman, USMC (argued); Captain T.C. Watson, Jr., JAGC, USN, Lieutenant Wm. Eric Minamyer, JAGC, USN (on brief).

## OPINION OF THE COURT

COOK, Judge:

Despite his pleas, the accused was convicted by general court-martial of sodomy with a child and one specification of lewd and lascivious conduct, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 925 and 934, respec-

tively. The adjudged and approved sentence extends to a bad-conduct discharge, confinement at hard labor for 5 years, forfeiture of all pay and allowances, and reduction to pay grade E–1. The Court of Military Review affirmed in a per curiam opinion. The case was submitted to us on the merits and we specified the following issues:

## I

WHETHER THE MILITARY JUDGE ERRED BY REFUSING TO ADMIT DEFENSE EXHIBIT U INTO EVIDENCE.

## II

WHETHER THE MILITARY JUDGE ERRED BY PERMITTING THE REBUTTAL TESTIMONY OF HM3 JOHN DAVID DEATON.

## I

■ The offenses of which the accused stands convicted were committed with the seven year old daughter of a neighbor. The discovery of the offenses came from the disclosures of one John Hastings, a friend of both parties. Hastings, while baby-sitting the children of both families, performed several sexual acts with the victim who told him that the accused had done similar things to her at other times. Hastings related his own misdeeds and the victim's revelations to the accused's wife, Callie, and said that he wanted to tell the victim's mother but did not know how. Eventually, the victim's mother was told and confirmed the story with the victim. This resulted in the accused being charged and placed in pretrial confinement. During the early part of the accused's pretrial confinement, Hastings assisted the accused's wife with certain of her domestic chores and took her to the commissary and to visit her husband in confinement. After having some sort of confrontation with Callie, Hastings, apparently motivated by feelings of guilt and remorse, brought her a tape cas-

sette which he had made containing his own feelings about their relationship, and the accused's predicament. At trial, defense counsel sought to introduce the cassette (Defense Exhibit U) through foundation testimony provided by Callie on the ground that the cassette was a declaration against penal interest by an unavailable witness.[1] After examining a transcript made from the tape, the military judge ruled that the cassette was inadmissible.

Defense counsel cited *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *United States v. Johnson*, 3 M.J. 143 (C.M.A. 1977), in support of his position. Our examination of these cases reveals that they foreclose rather than bolster his argument.

In *Chambers v. Mississippi, supra,* police officer Liberty was shot in the back during a confrontation with a group of some sixty citizens. The shot came from the crowd. Before dying, Liberty turned and aimed a shot from his riot gun into the crowd and hit Chambers as he ran down an alley. Three of Chambers' friends took him to the hospital. He was subsequently charged with Liberty's murder. One of the men who took Chambers to the hospital, McDonald, admitted to Chambers' attorneys that he was the one who had done the shooting and eventually executed a written confession. He also stated that he had told another friend that he had done the shooting with his own pistol which happened to be of the same caliber as the bullets removed from Liberty's body. Later at a preliminary hearing, McDonald repudiated his confession and swore that he was not at the scene. The presiding justice of the peace accepted the repudiation and released him. When Chambers' trial began, he defended on the grounds that he did not shoot Liberty and produced one witness to that effect, and on the further ground that McDonald was the real culprit. One defense witness testified that he saw McDonald shoot Liberty and a second witness testified that he saw McDonald immediately after

1. Hastings, a civilian, was wanted in New York to respond to a subpoena. Apparently he left

the area of Camp Lejeune. It was stipulated at trial that he could not be found.

the shooting with a pistol in his hand. In addition, Chambers attempted to show the jury that McDonald had admitted responsibility for the murder on four separate occasions. Chambers sought to have McDonald called as an adverse witness. On the stand McDonald repudiated his confession, which had been previously admitted and was before the jury. Chambers' attorney renewed his motion to treat McDonald as an adverse witness, but the motion was denied. Chambers then attempted to call the three witnesses to whom McDonald had confessed earlier, but the trial judge sustained an objection based on hearsay. Because of Mississippi's "voucher" rule,[2] Chambers was thus unable to cross-examine McDonald or to present witnesses who would have discredited McDonald's repudiation and demonstrated his complicity.

The Supreme Court reversed the conviction. It rejected the argument of the State that McDonald's testimony was not "adverse" to Chambers since, to the extent that McDonald's confession incriminated him, it tended also to exculpate Chambers. "The availability of the right to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness was initially put on the stand by the accused or by the State." 410 U.S. at 297–98, 93 S.Ct. at 1046–47. Hence, Mississippi's "voucher" rule "plainly interfered" with the defendant's right to defend against the charges. Id. at 298, 93 S.Ct. at 1047. However, the Supreme Court chose not to rest the decision on this point, but went on to consider the "ultimate impact" of the trial judge's refusal to permit Chambers to call the other witnesses. Noting that this decision was upheld by the State Supreme Court on the ground that such testimony would be hearsay, the Supreme Court recognized the so-called "declaration against penal interest" as an exception to the hearsay rule. However, it set out four conditions which must be met to insure reliability before the principle could be applied:

1. "[E]ach of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred."

2. Each confession "was corroborated by some other evidence in the case."

3. "[E]ach confession . . . was in a very real sense self-incriminatory and unquestionably against interest."

4. "[I]f there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath." 410 U.S. at 300–01.

We have had occasion to examine the applicability of the Chambers decision in United States v. Johnson, supra. There the accused was tried and convicted of murdering his first sergeant by detonating a "claymore" mine outside the sergeant's "hooch" in Vietnam. Prior to trial, a Private Tanner made a sworn statement, after proper advisement of rights, that he was the one who planted the bomb and pulled the pin. The military judge refused to admit Tanner's written confession, and Tanner refused to testify at trial on the grounds of self-incrimination. We reversed on the basis of Chambers, holding that "the evidence . . . 'bore persuasive assurances of trustworthiness.'" 3 M.J. at 147. Judge Perry, writing for the majority, held that:

Tanner himself initiated the conversation . . . in which he volunteered a statement regarding the first sergeant's murder; Tanner was fully advised of his rights under Article 31, UCMJ, 10 U.S.C. § 831, which rights he freely waived; his confession, complete with details of the crime's commission, is logical and is not inconsistent in any respect with the other evidence adduced at trial; his letter to the appellant is replete with motive for murdering [the first sergeant]; the con-

2. The effect of the "voucher rule" is "that a party who calls a witness 'vouches for his credibility,'" and hence is prohibited from impeaching him. Chambers v. Mississippi, 410 U.S. 284, 295–96, 93 S.Ct. 1038, 1045–46 (1973).

The rule is apparently a vestigial "remnant of primitive English trial practice" and is generally condemned in modern practice. Id. at 296, 93 S.Ct. at 1046. See authorities cited at 410 U.S. at 296 nn. 7–9, 93 S.Ct. at 1046 nn. 7–9.

fession undoubtedly is incriminatory and unquestionably against interest; the confession, as well as the letter to the appellant, are written in Tanner's own handwriting and signed by him; his declarations were made in the presence of four people apparently not associated in any way with Tanner, the appellant, or with the murder investigation; Tanner stood to benefit nothing from disclosing his culpability and he must have been aware of his liability to criminal prosecution resulting therefrom; the confession is corroborated by the testimony of ... [one witness] and by the stipulated testimony of ... [another witness] ...; if Tanner wished to renounce his confession or to reveal matters affecting its reliability or voluntariness, he was present in the courtroom and could have done so; and if the Government wished to "get behind" the facial reliability of the confession (as opposed to inquiring into matters surrounding the *crime*), Tanner was factually available in the courtroom to testify thereto and legally "available" via offering a testimonial grant of immunity, if necessary.

3 M.J. at 147–48.

In this case, there are not any such indicators of reliability. The cassette, while purportedly in Hasting's own voice, required independent testimony for identification. It was not under oath, and Hastings was not available for examination.[3] It was not clearly inculpatory as to Hastings except as to those acts performed on the victim by Hastings and was not, except under a strained interpretation, exculpatory as to the accused. Since there was already evidence before the court that at least two parties had performed the acts upon the

victim (the accused and Hastings), the sum of the admissions made by Hastings was ambiguous and could well have meant that Hastings only felt remorse for having incriminated the accused which resulted in his incarceration. Lastly, the admissions were neither spontaneous nor made "shortly after the ... [acts] occurred."[4] Not possessing the "persuasive assurances of trustworthiness"[5] found in the *Chambers* situation, the cassette was correctly excluded from consideration by the members.[6]

## II

■ The second issue concerns the purported rebuttal testimony of Hospitalman Third Class Deaton, relating to the testimony of the accused's wife. Mrs. Perner was called as a defense witness primarily to provide a foundation for the introduction of Hastings' cassette. She also testified to Hastings' admissions to her as to his complicity in performing sexual acts on the victim. This testimony was largely cumulative as it was already before the members by virtue of the testimony of the victim's mother. It was apparently the theory of the defense that Hastings had performed the acts and that the victim had mistakenly attributed them to the accused. After the cassette was rejected by the military judge, Mrs. Perner was excused from the stand without cross-examination by the trial counsel. However, at the conclusion of the defense case, trial counsel called Hospitalman Third Class Deaton, a psychiatric technician at the Naval Regional Medical Center at Camp Lejeune. Deaton testified that he had seen the accused's wife professionally on several occasions at the hospital, and over objection, was allowed to testify as to

---

**3.** "The availability of McDonald significantly distinguishes this case from the prior Mississippi precedent, *Brown v. State*, ... [55 So. 961 (Miss. 1911) ], and from the *Donnelly* [*v. United States*, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913) ]-type situation, since in both cases the declarant was unavailable at the time of trial." *Chambers v. Mississippi, supra* at 301, 93 S.Ct. at 1048 (footnote omitted).

**4.** The general tone of the cassette is a rambling and self-apologetic statement of Hastings' feel-

ings towards Mrs. Perner. There is only a small part devoted to the offenses for which the accused was then in confinement. The earlier admissions of Hastings made shortly after his own involvement with the victim are totally different.

**5.** 410 U.S. at 302, 93 S.Ct. at 1049.

**6.** *Cf.* Mil.R.Evid. 403.

his opinion of her credibility. He stated that he would characterize her behavior on those occasions as "erratic, basically immature, unpredictable" and that she was an "erratic, unstable type." Based on the information gleaned from these visits to the hospital, Deaton would question her credibility and her testimony under oath.

Paragraph 153*b* (2)(a), Manual for Courts-Martial, United States, 1969 (Revised edition), which was in effect at the time this case was tried, provides in pertinent part: "For the purpose of impeachment, it may be shown that a witness has a bad character as to truth and veracity." This single sentence has provided very little enlightenment to those seeking to attack the credibility of a witness by virtue of her reputation for truth and veracity. However, further amplification is provided in paragraph 138*f* (1), Manual, *supra:*

> When proof of the character of a person is admissible, the opinion of a witness as to that person's character may be received in evidence if it is shown that the witness has such an acquaintance or relationship with the person so as to qualify him to form a reliable opinion in this respect. Another method of proving character is by introducing evidence of reputation for the kind of character involved. By "reputation" is meant the repute in which a person generally is held in the community in which he lives or pursues his business or profession.

■ Thus, proof of character of a witness may be made by means of the opinion of a witness who has enjoyed a sufficiently close acquaintance with the person in question to justify the formation of a reliable judgment or through testimony as to her general reputation in the community. *United States v. Haimson,* 5 U.S.C.M.A. 208, 17 C.M.R. 208

(1954); *United States v. Griggs,* 13 U.S.C. M.A. 57, 32 C.M.R. 57 (1962) (interpreting similar language in the Manual for Courts-Martial, United States, 1951). However, specific acts of the witness may not be used as the basis for attacking her character for truth and veracity. *Michelson v. United States,* 335 U.S. 469, 477, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948); *United States v. Tomcheck,* 4 M.J. 66, 72 (C.M.A. 1977).[7]

Deaton's testimony was based upon three encounters with Mrs. Perner at the hospital and not upon her general reputation for truth and veracity in her community. Nor do three encounters under these circumstances qualify Deaton as a person whose relationship with the witness is sufficient for him to form a reliable opinion as to her character for truth and veracity. Indeed, his opinions as to her instability of personality do not necessarily support his opinions as to her credibility as a witness. Consequently, his testimony was improperly admitted by the military judge. However, this error did not rise to prejudicial proportions in this case. Mrs. Perner's testimony was of a very limited nature: it was directed only at providing a foundation for the introduction of the Hastings' cassette. The cassette was not admitted. The remainder of her testimony went only to Hastings' earlier admissions of sexual misconduct with the victim, which were already in evidence before the members. Thus, whatever may have been the effect of Deaton's testimony regarding Mrs. Perner's credibility, it could not have prejudiced the accused.[8]

The decision of the United States Navy Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.

---

7. *Cf.* Mil.R.Evid. 803(21) and 608; *see* McCormick's Handbook of the Law of Evidence § 44 (Cleary ed. 1972); V Wigmore, Evidence § 1616 (Chadbourn revision 1974); VII Wigmore, Evidence §§ 1980–82 (Chadbourn revision 1978).

8. Article 59(a), Uniform Code of Military Justice, 10 U.S.C. § 859(a).