UNITED STATES

v.

Alvin W. DODSON, Jr., 230 98 7418, Private First Class (E–2), U.S. Marine Corps.

NMCM 82 3623.

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 23 Dec. 1981.

Decided 30 Aug. 1983.

Joseph Remcho, Civilian Counsel.

Kathleen J. Purcell, Civilian Counsel.

LCDR Richard K. Delmar, JAGC, USNR, Appellate Defense Counsel.

LCDR Michael R. McGuire, JAGC, USN, Appellate Government Counsel.

Before BOHLEN, EOFF and KERCHE-VAL, JJ.

EOFF, Judge:

Appellant was tried by a general court-martial constituted of officer members. Contrary to his pleas, appellant was convicted of attempted robbery, conspiracy to commit robbery, premeditated murder, felony murder, robbery and wrongful communication of a threat, in violation of, respectively, Articles 80, 81, 118, 122 and 134, Uniform Code of Military Justice, (UCMJ), 10 U.S.C. §§ 880, 881, 918, 922 and 934. He was sentenced to confinement at hard labor for life, forfeiture of all pay and allowances, reduction to the lowest enlisted pay grade and a dishonorable discharge. The convening authority approved the findings and sentence without modification.

Appellant has assigned seven, separate errors. We will address the first five.

## I. The Conviction Should be Reversed on the Facts

On the early morning of 1 June 1981, the victim, Corporal Murphy, was drinking at the "Snack" Shige in Henoko Ville, Okinawa, Japan. Appellant, Private First Class (PFC) Garrett and Lance Corporal (LCPL) Chupp were on liberty together in Henoko that morning. PFC Garrett was dressed in dark pants and a blue windbreaker, appellant wore dark clothing, and LCPL Chupp wore a T-shirt and baseball cap. Corporal Murphy was carrying a large amount of money and offering to pay for drinks. His actions could be observed by others in the bar, including PFC Garrett. LCPL Chupp, a white male, and PFC Garrett, a black male, left the Snack Shige and joined a taller black male outside. They looked in the Snack Shige several times. On one of these occasions Corporal Murphy offered to buy them a drink. When they declined, he appeared to get upset and went outside. Mrs. Gould, a friend of Corporal Murphy's who was at the Snack Shige, went outside to see what was happening. She observed Corporal Murphy with two black males and a white male. The taller black male was waving a silver pointed object in Corporal Murphy's face and saying, "I'm going to get you man." When

Mrs. Gould appeared, the confrontation broke up, Corporal Murphy returned to the Snack Shige, and the remaining three departed. As Corporal Murphy reentered—upset and red faced—he hit the door with his fist and stated that the three men were wielding a knife, a pipe and a stick, and that they were trying to rob him. PFC Garrett testified they were just "screwing around" with him, that he had put his arm around Corporal Murphy and may have even touched his wallet.

Murphy stayed at the Snack Shige and left between 0230 and 0300 by saying he was calling it a night. At about 0300 PFC Garrett was seen at the Snack Shige. A Marine testified that, as he was walking his girlfriend to her home about 0300, a black male, dressed in dark clothing and a windbreaker, walked rapidly past them and disappeared around a corner. Shortly thereafter, the same person reappeared with another tall black male who was dressed in dark clothing. They returned back up the street and turned right at the top of a hill. The path the two men were taking was in the direction where Corporal Murphy's body was later found.

Appellant, PFC Garrett and LCPL Chupp took a taxi back to Camp Schwab and logged-in at the gate at 0319. The cab driver testified he picked them up near the Snack Hana, which was around the corner from where Corporal Murphy's body was discovered between 0430 and 0440 that morning. His empty wallet was found next to him. An autopsy revealed he bled to death from a stab wound in the back which punctured one of his lungs and his aorta. He had other nonfatal stab wounds and abrasions. The doctor who performed the autopsy was of the opinion that the attacker who inflicted the fatal wound would have been covered with blood, but this would be less likely had the fatal wound been inflicted while Corporal Murphy was on the ground. An Army serologist tested various items of clothing seized from appellant and PFC Garrett. Probable human blood stains were found on PFC Garrett's windbreaker, pants and shoes. No blood

stains were found on appellant's clothing. The cab driver who took the three men back to Camp Schwab testified he noticed nothing unusual in their appearance and noticed no blood on their clothing.

Private Weaver, who occupied a cell in the same area of the brig as appellant, PFC Garrett and LCPL Chupp testified as to conversations among the three men. He stated that he heard appellant say "F___k that swine. I'm glad we did it. He shouldn't have been f___king around with Garrett anyway."

Based upon these facts, appellant has raised several alternative conclusions which point away from findings of guilty. These same conclusions were vigorously argued before the court members prior to their arriving at what we also find to be appropriate and sustainable findings of guilty.

## II. The Accused Was Denied His Right to Speedy Trial

Both parties agree that appellant was in pretrial confinement for a period of 89 days before his release on 1 September 1981. The following chronology which is substantially the same as that stipulated to by the parties sets out the events leading up to the first session of this trial:

1 June 1981 Alleged offenses occurred. Okinawa Prefectual Police assume primary jurisdiction. CID responds to initial complaint. NIS begins bi-lateral investigation.

2–3 June Numerous investigative leads followed in effort to identify suspects.

4 June Co-accused GARRETT identified as suspect, taken into custody by Japanese Police, released to NIS and confined during early morning hours of 5 June. CID criminal investigation report complete.

5 June Co-accuseds DODSON and CHUPP apprehended and confined. Permissive search of GARRETT's and CHUPP's personal belongings conducted. CHUPP makes written statement to NIS. GARRETT makes oral statement to NIS. Japanese authorities relinquish primary jurisdiction over all of-

fenses except a violation of Japanese "Sword and Firearms Law." DODSON provided and consults with legal counsel Major B.A. WARD, USMC.

10 June NIS report from Annapolis completed. Clothing seized from DODSON, GARRETT and CHUPP given to Japanese police for lab examination.

11 June NIS report from Washington, D.C.

12 June GARRETT administered, at his request, polygraph examination.

15–16 June GARRETT questioned by Japanese Police.

16 June NIS report from Great Lakes completed.

17 June NIS report from Camp Lejeune and Washington, D.C. completed.

17–19 June Numerous interviews of individuals acquainted with the suspects and/or victim were conducted.

20 June Original charges preferred against accused.

22–26 June Japanese police provide NIS with copies of statements taken from possible witnesses within the Japanese community.

22–23 June Copies of service records of 3 co-accused prepared and provided to defense counsel.

29 June NIS (Camp Hansen) interim report completed.

30 June NIS (Annapolis) report completed.

1–2 July Copies of NIS interim report provided to defense counsel.

6 July Meeting held among Article 32 investigating officer, trial counsel, asst. trial counsel, MAJ Ward, (DODSON'S detailed defense counsel), and CAPT Canode (Garrett's detailed defense counsel). Government attempts to establish date of 10 July 81 for Art. 32 investigation. Both defense counsel request continuance until 18 July 81.

7 July Addendum to NIS report forwarded to defense counsel.

9 July Forensic pathological report of victim completed by Japanese.

11 July Magistrate's hearing materials copied and provided in response to defense request. Health records of CHUPP and GARRETT copied and

provided to defense counsel. Search for DODSON's health record, in response to defense discovery request, produces negative results.

13 July Numerous personnel who had been incarcerated with the suspects were interviewed.

14 July Additional charges preferred against accused.

15 July Two primary government witnesses interviewed in brig. Pvt. Kenneth L. HOWARD and LCpl Steven S. WEAVER. WEAVER makes written statement. Government sent a message requesting an in depth interview of potential key witness who is incarcerated at Leavenworth.

16 July Aerial Photos of Henoko prepared at defense request and provided to Defense Counsel.

17 July PVT Daniel ROBBINS interviewed at the Disciplinary Barracks, Leavenworth, makes written statement. Civilian defense counsel, Mr. Joseph REMCHO, arrives Okinawa, Japan. LCpl WEAVER re-interviewed. Service records of Corporal MURPHY copied and furnished to defense in response to discovery request. NIS receives Japanese Pathology report.

18 July Article 32 begins.

19 July Government made aware of results of interview with PVT ROBBINS, via telephone. Key government witness Mrs. Sandra E. GOULD departs island for new location in Hawaii. DODSON makes demand for speedy trial. Trial counsel and asst. trial counsel interview LCpl WEAVER for first time. DODSON's first discovery request.

20 July Art. 32 investigation continues. LCpl WEAVER makes a second written statement. Additional brig confinees interviewed. Translation of Pathology report.

21 July Art. 32 investigation continues. Government receives message detailing results of interview with PVT Daniel ROBBINS. Art. 32 investigation continues. Defense provided with copy of

Pathology report. Crime lab report completed.

22 July DODSON makes request for discovery, also requests PVT Daniel ROBBINS be made available as witness. NIS receives clothes back from lab.

23 July Witness WEAVER transferred and confined at MCAS, Iwakuni, Japan.

24 July Translation of Japanese lab report completed.

25 July Art. 32 investigation continues. Third Battalion, 4th Marines, including appointing authority, depart Okinawa for Camp Fuji, Japan. Defense counsel provided with copy of lab report.

27 July Art. 32 investigation continues. GARRETT requests additional polygraph.

28–29 July Art. 32 investigation continues.

30 July PVT. Kenneth L. HOWARD, USMC, re-interviewed, makes a written statement. PFC Aaron Todd JONES USMC, while being apprehended for drunk and disorderly conduct, is overheard confessing to killing victim "MURPHY". While being interrogated JONES admits his confession is false and provides alibi for night in question.

31 July DODSON makes request for discovery.

2 Aug Detailed (defense counsel) to Iwakuni TAD for SPCM.

3 Aug GARRETT undergoes additional polygraph.

7 Aug Detailed (defense counsel) returns from Iwakuni.

8 Aug Art. 32 investigation continues.

9 Aug Mr. REMCHO contacts CAPT HOPSON via telephone, makes request for a tentative trial timetable.

10 Aug Art. 32 investigation continues and closes.

11 Aug NIS conducts expanded crime scene search, attempts to locate murder weapon.

13 Aug PFC Robert E. PORTER, USMC, is interviewed and verifies "JONES" alibi on night in question.

14 Aug Government reopens Art. 32 investigation, closes same day.

15 Aug Verbatim transcript of Art. 32 investigation completed.

17 Aug Asst. trial counsel hand carries Art. 32 transcript, investigating officer's recommendation, and clothing seized from 3 co-accuseds to Camp Fuji and Camp Zama, Japan.

18 Aug Battalion Commander reads Art. 32 transcript and signs recommendation for trial by General Court-Martial. Crime lab re-examination of clothing complete. Asst. trial counsel travels from Yokota to Camp Zama.

19 Aug Article 34 advice letter completed. Defense counsel sends two mailgrams requesting discovery and requesting witnesses at government expense. Gov't does not receive mailgram regarding request for witnesses.

20 Aug Charges referred to trial, accused served with copy of charges. Art. 32 transcript sent to civilian counsel via courier.

21 Aug Asst. trial counsel travels from Camp Zama to Yokota to Iwakuni, talks with WEAVER, then returns to Okinawa. PVT. Daniel ROBBINS administered hypnotic interview at Fort Leavenworth in an attempt to ascertain name of potential witness. Prosecution received one defense mailgram of 18 Aug.

22 Aug Government receives message detailing travel itinerary for return of PVT ROBBINS. Government receives additional message informing of hypnotic interview.

23 Aug NIS begins attempts to locate potential witnesses identified during hypnotic interview.

24 Aug Docketing session held. Art. 39(a) session for DODSON case set for 1 Sept. Art. 39(a) session, case of GARRETT set for 31 Aug., Art. 39(a) session for CHUPP case set for 31 Aug.

25 Aug Discovery material sent via courier to civilian counsel.

27 Aug Additional, requested, discovery material sent to civilian counsel via courier.

31 Aug Military forces on Okinawa in tropical cyclone condition 1 (emergency), all normal working activities shutdown due to typhoon. PVT ROBBINS arrives Okinawa and confined.

1 Sept Art. 39(a) session held in GARRETT case. Defense request for continuance to 5 Oct. granted. DODSON released from confinement. Defense counsel informed government will seek continuance in case.

2 Sept 39(a) session held for DODSON case. NIS investigation still going on.

 In the instant case, pretrial confinement was not of sufficient duration to trigger the presumption of prejudice enunciated in *United States v. Burton,* 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971). The government is required to show that it proceeded with reasonable diligence, without deliberate oppression of appellant, and without a lack of concern for the requirement of expeditious prosecution. *United States v. Hagler,* 7 M.J. 944 (N.C.M.R.1979). Thus, the sixth amendment right to speedy trial provides the appropriate standard for assessing the Government's conduct and requires that we consider: (a) the length of the delay; (b) the reasons for the delay; (c) specific prejudice to the appellant; and (d) any demand for speedy trial. *United States v. Amundson,* 48 C.M.R. 914, 917 (N.C.M.R. 1974), citing *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

 Appellant asserts specific prejudice in that his defense team was required to make an unnecessary trip to Okinawa at his expense due to the government's manipulation of the trial schedule.

Appellant's civilian trial defense counsel and trial counsel had a phone conversation in mid-August concerning scheduling of the case. Trial counsel stated that he informed opposing counsel that the government intended to try PFC Garrett first so that he could be called as a witness at appellant's trial. The first session of PFC Garrett's trial was scheduled to be held 29 August or later. Civilian defense counsel assumed PFC Garrett's case would last a week and

that appellant's trial could start as early as 7 or 8 September. Based on this, the three members of the defense team proceeded to Okinawa from San Francisco and arrived there on 31 August. Due to the military judge granting a continuance in PFC Garrett's case until 5 October, the government asked for a continuance in appellant's trial. The defense offered to stipulate to PFC Garrett's testimony in order to proceed with the trial as soon as possible. The defense stipulation was narrower in scope than the testimony the government expected to elicit from PFC Garrett. The government, therefore, declined to join in the stipulation. The military judge then granted a continuance until a later date to be set by the court and the parties upon completion of PFC Garrett's trial. The next session was called to order on 3 December.

As evident from a reading of the facts of this case and the preceding chronology, the preparation of appellant's court-martial was considerably more complicated and difficult than most. The additional delay until after PFC Garrett's trial is not without precedent. *Barker v. Wingo, supra; United States v. Johnson,* 3 M.J. 143 (C.M.A.1977). Appellant suffered additional expenses when both civilian defense counsel and their investigator made an extra trip to Okinawa. However, this was occasioned by a defense request for a continuance in PFC Garrett's case and not by a deliberate desire on the part of the government to prejudice appellant in his defense. The other instances of prejudices cited by appellant due to the delay have been considered and found to be unconvincing. The several instances of demands for speedy trial made by appellant were answered by continued progress to trial by the government.

After considering the government's conduct under the standards set out in *Amundson, supra,* we find the appellant was not denied his right to a speedy trial.

III. The Government Improperly Used the Testimony of PFC Garrett to Inject Inadmissible Evidence and Taint the Trial

■ Appellant asserts that the fact of PFC Garrett's conviction was improperly

brought to the court's attention by the trial counsel's examination of a prosecution witness, Miss Takara. The subject of her testimony at a prior proceeding was first broached by the lead defense counsel, who asked if she had "testified" at a prior "hearing." Later, on redirect, the government counsel referred to her being asked "questions" at "that same trial." PFC Garrett did not testify until five witnesses later. The military judge admonished trial counsel to avoid any references to a prior trial and did not issue an instruction to the members. Defense counsel chose to use the word "testimony"; therefore, whether labeled as a hearing or a trial, the perception of the members was most likely the same. There was no reference to whose trial or the result. Accordingly, we find no prejudice to appellant.

■ Appellant also alleges in this assignment of error, that the government used the testimony of Private Robbins, in the guise of impeaching PFC Garrett, as a ruse to bring impermissible hearsay before the members. Private Robbins testified as to two statements made by PFC Garrett out of the presence of appellant. On the first occasion, PFC Garrett stated, "It does look bad because I did have a knife with me that night." On the second occasion, Private Robbins overheard a jail cell soliloquy of PFC Garrett in which he stated, "I wish I wouldn't have brought the knife that night ... nobody was supposed to get hurt."

From the outset, we do not view Private Robbins' testimony as being governed by hearsay considerations. The fact that PFC Garrett's prior statements were unsworn, would only be relevant if the government were attempting to enter them under Mil.R. Evid. 801(d)(1)(A) when the prior statement was "given under oath subject to the penalty of perjury." It is only when the extrajudicial statement is offered "to prove the truth of the matter asserted" that hearsay considerations control. Mil.R.Evid. 801(c).

In the instant case, the government offered Private Robbins' testimony concern-

ing PFC Garrett's statements, not for the "truth of the matter asserted," but rather, as impeachment of PFC Garrett's credibility by characterizing Private Robbins' testimony as extrinsic evidence of prior inconsistent statements under Mil.R.Evid. 613(b). The use of extrinsic evidence for impeachment of a witness is limited to matters which are non-collateral, that is, those matters relevant to the determination of factual matters having a direct bearing upon guilt or innocence of the accused. Had PFC Garrett denied wearing "red sneakers" while in the brig, such would be collateral and Private Robbins could not be called to impeach PFC Garrett solely for that reason. To do so would unduly divert the members' attention from more probative matters. See generally Munster, *Military Evidence, 2d Ed.* 361–363 (1978).

A witness to the altercation outside of the Snack Shige, Mrs. Gould, testified that she observed a shiny, pointed object in the hand of the taller of the two black assailants (presumedly appellant), although she could not positively identify the object as a knife. PFC Garrett testified as to the circumstances of the altercation, including a description of clothing worn by himself and the co-defendants, the presence of another witness in addition to Mrs. Gould, and the actions of himself and the co-accuseds after the altercation ended. PFC Garrett, however, denied having a knife that evening. His two prior statements relating to possessing a knife were directly related to a factual matter probative of guilt or innocence of appellant. To believe Private Robbins' testimony, that the statements were made, would cause the members to doubt the truth of PFC Garrett's denial, and thus believe that he either possessed a knife that evening or supplied one to appellant or LCPL Chupp.

This is a proper use of impeachment and a proper result of an attack upon a witness' credibility so long as the military judge instructs the members to view the impeachment evidence, not as substantive evidence, but rather, as being determinative of the credibility of the witness. In the instant case, the military judge issued the appropri-ate instruction on two occasions: first, in his instructions to the members prior to their deliberation on findings; and second, in response to the trial counsel erroneously referring to the statements as substantive evidence during closing argument.

We are unconvinced that government counsel harbored ill motives by using Private Robbins' testimony to impeach PFC Garrett. This was not an occasion in which the sole purpose for calling PFC Garrett was to impeach him. See *United States v. DeLillo,* 620 F.2d 939 (2d Cir.1980). As previously mentioned, he testified to a number of matters. Because he was a previously convicted accused called as a government witness, it was reasonably foreseeable that the government would have to impeach its own witness. Furthermore, the government's ability to foresee the trouble spots in PFC Garrett's testimony was hampered by his trial defense counsel's refusal to allow him to be interviewed by the government prior to his taking the stand.

Lastly, we conclude that the military judge did not abuse his discretion by finding that the prejudicial effect of Private Robbins' testimony did not outweigh its probative value, especially in light of his cautionary instruction. See *United States v. Leslie,* 542 F.2d 285 (5th Cir.1976).

### IV. Hearsay Statement Attributed to the Deceased Should Not Have Been Admitted into Evidence

Appellant challenges the admission of testimony regarding statements attributed to the victim, Corporal Murphy. Immediately after Mrs. Gould interrupted the altercation outside the Snack Shige, she testified that while returning with Corporal Murphy to the bar, "(H)e told me that they had tried to rob him, that the taller white male also had a butterfly knife behind his back, I guess concealed, and so did Garrett." She described Corporal Murphy's appearance as, "His face was flushed, his eyes were bulging, and he seemed very nervous." Prior to entering the bar, they were joined by LCPL McCurry, who also described Mur-

phy as nervous. Upon entering the bar, both Mrs. Gould and LCPL McCurry testified that Corporal Murphy struck, and dented, the aluminum door to the bar. LCPL McCurry testified Corporal Murphy then said "that they tried to take his money and that no one could take his money, they would have to kill him first." Regarding the same outburst, Mrs. Gould testified:

> He muttered something about they had tried to rob him; if anybody wanted his money, they would have to kill him first.
>
> \* \* \* \* \* \*
>
> He said several times that if anybody wanted his money, they would have to kill him, he wasn't going to give it up. He worked very hard for his money, and he also showed us how the taller white male had tried to take his wallet.

About an hour after the altercation, Corporal Murphy left the Snack Shige and spoke for about fifteen minutes with a Japanese national, Ms. Tsukayama. She testified that he stated, "He was looking for two blacks and one white."

■ The military judge admitted Mrs. Gould's and LCPL McCurry's testimonies as excited utterances of Corporal Murphy under Mil.R.Evid. 803(2). He gave a limiting instruction regarding those portions of the statements in which Corporal Murphy stated if anyone wanted to rob him that they would have to kill him. He instructed the members to consider those portions only for the purpose of establishing Corporal Murphy's "state of mind," and not the state of the accused's mind. The remainder of the statements were considered equally with other substantive evidence. Ms. Tsukayama's testimony was admitted as evidence of Corporal Murphy's "state of mind."

We find that the military judge did not abuse his discretion by admitting as excited utterances, those portions of Mrs. Gould's and LCPL McCurry's testimonies which directly related to the circumstances of the altercation. We find, however, that those portions of their testimonies concerning Corporal Murphy's intent to resist being robbed, even at the risk of being killed, were more probative as evidence of his state of mind, than as evidence to explain the event. Although tangentially admissible as excited utterances, it would have been better to admit such evidence under Mil.R.Evid. 803(3) to prove that Corporal Murphy later acted in conformity with his stated intent. Despite his misdesignation, the military judge, nonetheless, gave an instruction consistent with that required for state of mind evidence. The fact that we prefer a different theory of admitting evidence at trial does not prevent us from finding it admissible upon review. *See United States v. Barnes,* 586 F.2d 1052 (5th Cir.1978).

■ As for Corporal Murphy's statement to Ms. Tsukayama, we also find that it was properly admitted as evidence of his state of mind under Mil.R.Evid. 803(3). A nexus between the statement and the altercation need not be shown. Instead, it must be shown how his stated intent is relevant to factual matters having a direct bearing upon the guilt or innocence of the accused. In the instant case, Corporal Murphy stated to Mrs. Gould, prior to leaving the Snack Shige for the evening, that he was going home to Camp Schwab. His subsequent statement to Ms. Tsukayama is relevant to explain the location of his body at a point not along a direct route from the bar to his barracks and that his intended confrontation of the "two blacks and a white" may have taken place. *See United States v. Pheaster,* 544 F.2d 353 (9th Cir.1976) (out-of-court statement of kidnap victim as to whom he planned to meet at the approximate time of the kidnapping admitted under state of mind exception).

We also find no confrontation clause problems by the use of the deceased victim's statements. With each statement, there were sufficient corroborating circumstances to ensure their trustworthiness. *See United States v. Johnson,* 3 M.J. 143 (C.M.A. 1977). There was sufficient evidence regarding the victim's level of intoxication that cross-examination of the victim as to his perception, even if possible, would have achieved little extra.

V. Expert Testimony Relevant to the Reliability of the Key Prosecution Witness was Improperly Excluded

■ The military judge denied appellant's request for an order requiring the government to pay the expenses and reasonable expert witness fees of Prof. Craig Haney, a psychologist, who held himself out as an expert in the field of perception and memory. He also ruled that if the testimony of Prof. Haney were to be offered by the defense it would be inadmissible. The military judge stated two grounds. First, he concluded that the testimony would invade the province of the fact finders because issues to which Prof. Haney would testify could be resolved by an average juror based upon his or her observation of the witness, the cross-examination of the witness and other evidence introduced in the case. Second, the judge found that the prejudicial effect of the proposed testimony outweighed its probative value. We find that the military judge did not err in denying appellant's request. Prof. Haney's proffered science is not so generally accepted within the scientific community as to meet the standards of reliability applicable to scientific evidence. *United States v. Fosher,* 590 F.2d 381 (1st Cir.1979); *See United States v. Amaral,* 488 F.2d 1148 (9th Cir. 1973).

We find assignments of error VI and VII to also be without merit. Accordingly, the findings and sentence as approved on review below are affirmed.

Senior Judge BOHLEN * and Judge KERCHEVAL concur in the result.

* Senior Judge Bohlen took final action in this case prior to his retirement from the Court on June 30, 1983.