UNITED STATES, Appellee,

v.

Derek C. ARMON, Staff Sergeant,
U.S. Army, Appellant.

No. 98–0388.
Crim.App. No. 9601892.

U.S. Court of Appeals for
the Armed Forces.

Argued Jan. 21, 1999.

Decided July 21, 1999.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and SULLIVAN and CRAWFORD, JJ., joined. EFFRON, J., filed an opinion concurring in part and in the result.

For Appellant: *Captain Marc D.A. Cipriano* (argued); *Colonel John T. Phelps, II, Lieutenant Colonel Adele H. Odegard,* and *Major Leslie A. Nepper* (on brief); *Lieutenant Colonel Michael L. Walters* and *Captain Mary J. Bradley.*

For Appellee: *Captain Arthur J. Coulter* (argued); *Lieutenant Colonel Eugene R. Milhizer* and *Major Patricia A. Ham* (on brief); *Colonel Russell S. Estey* and *Captain Chris A. Wendelbo.*

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer members convicted appellant, pursuant to his pleas, of 3 specifications of making false official statements and 4 specifications of wrongfully wearing unauthorized military accouterments, in violation of Articles 107 and 134, Uniform Code of Military Justice, 10 USC §§ 907 and 934, respectively. The offenses arose when appellant wore a Special Forces tab; a Special Forces combat patch, signifying that he had served with a Special Forces unit in a combat zone; the Combat Infantryman's Badge (CIB); and a parachutist badge with a bronze star, signifying a parachute jump under combat conditions. The false official statements arose from appellant's representations that he was entitled to wear the above-described accouterments. The adjudged and approved sentence provides for a bad-conduct discharge, confinement for 30 days, and reduction to the lowest enlisted grade.

This Court granted review of the following issue:

WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR WHEN ALLOWING THREE GOVERNMENT WITNESSES TO OFFER THEIR OPINIONS DURING PRESENTENCING TESTIMONY BEFORE PANEL MEMBERS REGARDING WHETHER APPELLANT SHOULD RETURN TO SERVE IN HIS UNIT.

We affirm, for the reasons set out below.

During the sentencing hearing, the prosecution presented the testimony of four witnesses: Colonel (COL) Newman, Captain (CPT) Estok, Master Sergeant (MSG) Falaniko, and Sergeant First Class (SFC) Hutchinson. The granted issue pertains only to the testimony of COL Newman, MSG Falaniko, and SFC Hutchinson.

The thrust of the prosecution's aggravation evidence was to show the adverse impact of appellant's offenses on the soldiers serving with him. During *voir dire* of the members, trial counsel told them that there was no "traditional victim" who had been injured and no lost property, and then asked the members if they would agree that there are "crimes under the Code that have no traditional victim." He followed with questions asking if the members agreed that "there are offenses that undermine the morale of the unit," "the good order and discipline of the unit," and "the image of the Army as a whole."

COL Clyde Newman, commander of the 3d Brigade, 82d Airborne Division, testified that he had commanded Company B, 1st Ranger Battalion, during the invasion of Grenada. COL Newman had a CIB and combat jump stars for his participation in military operations in Grenada. He also wore the combat patch of the 1st Ranger Battalion, having served with that unit in Grenada. He testified that these combat awards were "important and distinctive," for other infantryman and paratroopers and for him personally. COL Newman felt a special bond with other soldiers wearing the same combat patch. Asked how he reacts when he sees other soldiers wearing the same decorations, he responded, "I usually want to go hug them."

Appellant claimed to have participated in a combat jump with the 1st Ranger Battalion during the operation in Grenada. COL Newman testified that he had spoken with appel-

lant about the jump and that appellant had lied about participating in it.

COL Newman testified that the combat jump into Grenada was a "significant emotional event." He explained, "Some things you remember what you do. If you jump at day or night, with reserve or not." In response to questioning by trial counsel, he testified further as follows:

Q: Sir, is this the first soldier you've run into that's made this claim?

A: No.

Q: So you've had an opportunity to form an opinion about the character of soldiers who lie about service in Grenada?

A: Yes.

Q: And what would that opinion be?

A: Poor.

Q: Sir, when the accused came into your office that day and lied to you about combat in Grenada, did you form an opinion about his character?

A: I know it was something less than outstanding.

Q: Sir, do you find it offensive when an NCO claims that they [sic] were a part of your company in Grenada when he wasn't?

A: Yes.

Q: And finally, sir, as a two-time combat veteran, based upon what you've seen of the accused, if you were jumping into combat tomorrow, would you want him around?

A: Nope.

On cross-examination, COL Newman testified that he did not know appellant and was not familiar with his service record.

CPT Estok, appellant's company commander, testified that he relied on appellant's misrepresentation that he had served in a Special Forces unit to conclude that appellant was "a subject matter expert" in demolition training. He testified that soldiers' lives were endangered during the training, because appellant "did not appear to really understand what was going on at the range."

Appellant's former first sergeant, MSG Falaniko, testified at some length concerning his investigation of appellant's representations and his own duties as an instructor at the Engineer School. MSG Falaniko was appellant's first sergeant from October of 1995 until August of 1996. As first sergeant, he assessed appellant's duty performance on a regular basis. He knew appellant well enough to select him to be the next platoon sergeant. MSG Falaniko testified that appellant, as a squad leader in an engineer company, would "deal with live demolition and live mines." If appellant had not received the training in demolitions that he said he had received, he could kill or injure his soldiers. MSG Falaniko testified that "as a result of what's transpired lately," appellant could not effectively train and lead troops.

Finally, SFC Hutchinson, a member of another unit in the 82d Airborne Division, testified he was entitled to wear the CIB, as well as a combat star on his jump wings for the jump into Grenada. He testified that the CIB and combat star are important to soldiers and to him. He explained, "It shows my soldiers and my officers, the platoon leaders that I have come in and that I'm required to help train, it shows them that I have done something, that I do know what I'm doing in my job."

He testified that appellant's wearing of the jump wings and CIB made him a "blatant liar." He testified that appellant's misrepresentations hurt him personally, because he "jumped into Grenada and there are only a few of us left in the Army that have done that." He explained that "there is a bond that we did jump onto an airfield while under fire." Finally, SFC Hutchinson testified that appellant "is not capable of leading troops because he lied about his service."

On cross-examination, SFC Hutchinson admitted that he did not know appellant personally, had not served with him in a unit, and had not observed his duty performance. On redirect, SFC Hutchinson was asked, "[B]ased upon what you've heard today, would you want to serve with Sergeant Armon in an [sic] unit?" He responded, "Absolutely not, sir." Trial counsel asked, "So it was just enough what's happened in here today?" SFC Hutchinson explained:

Yes, sir, because the Army is built on integrity and trust; and, if you're not honest about what you've done in your past, then how can an officer or a soldier for that matter look to you for guidance and leadership in making a decision, if you have to make, you know, a split second decisions [sic], especially when you're in combat. How can a soldier look at you like that? Like you got some trust and honesty about yourself.

The defense objected to MSG Falaniko's testimony about the danger posed by appellant conducting demolition training without proper training, but the objection was on the ground that it was "all speculation." The defense made no other objections to the testimony of COL Newman, MSG Falaniko, and SFC Hutchinson.

In sentencing argument, trial counsel continued the theme of emphasizing the impact of appellant's offenses on soldiers. He argued that appellant chose to wear awards that are the most important to soldiers and the most meaningful, because "you can't go to a school for them, you have to actually be there." He argued that appellant's "imaginary qualifications" caused his chain of command to give him dangerous duties that he was not qualified to perform. He called attention to the personal hurt inflicted on SFC Hutchinson. He asked the court members to think about leadership, asking "[H]ow can soldiers and troops follow leaders who lie to them, right out in the open, on their uniform; and, then lie to their leader when they're asked about it." Finally, he asked the court members to send a message "to other soldiers who want to be PX Rangers, who want to be PX Heroes." Trial counsel suggested that appellant be sentenced to a dishonorable discharge, total forfeitures, and confinement for 30 months. The maximum punishment was a dishonorable discharge, total forfeitures, confinement for 17 years, and reduction to the lowest enlisted grade.

The military judge instructed the members that all of the evidence they had heard was relevant to sentencing. The defense did not object to the instructions or request any additional instructions regarding the testimony of the three witnesses at issue.

Appellant now asserts that it was plain error for the three witnesses to testify that he lacked any rehabilitative potential and to euphemistically state that he should be punitively discharged from the Army. The Government argues that the testimony was proper aggravation evidence showing the impact of appellant's misconduct on military discipline. Both sides cite *United States v. Ohrt*, 28 MJ 301 (CMA 1989), and *United States v. Horner*, 22 MJ 294 (CMA 1986), in support of their positions.

RCM 1001(b)(4), Manual for Courts–Martial, United States (1995 ed.),* authorizes a trial counsel to "present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." This evidence may include "evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense." *Id.*, Discussion.

RCM 1001(b)(5)(A) authorizes a trial counsel to introduce evidence "in the form of opinions concerning the accused's previous performance as a servicemember and potential for rehabilitation." Regarding the foundation for such opinions, RCM 1001(b)(5)(B) provides as follows:

> The witness or deponent providing opinion evidence regarding the accused's rehabilitative potential must possess sufficient information and knowledge about the accused to offer a rationally-based opinion that is helpful to the sentencing authority. Relevant information and knowledge include, but are not limited to, information and knowledge about the accused's character, performance of duty, moral fiber, determination to be rehabilitated, and nature and severity of the offense or offenses.

RCM 1001(b)(5)(C) requires that the basis for an opinion regarding an accused's reha-

---

* All Manual provisions are cited to the version in effect at the time of trial. The 1998 version is unchanged, unless otherwise indicated.

bilitative potential be based on information and knowledge of "the accused's personal circumstances." Such an opinion may not be based principally on "the severity or nature of the accused's offense or offenses." RCM 1001(b)(5)(D) prohibits testimony about the appropriateness of a punitive discharge or whether the accused should be returned to the accused's unit. RCM 1001(b)(5) is based on this Court's decisions in *United States v. Pompey*, 33 MJ 266 (1991); *United States v. Claxton*, 32 MJ 159 (1991); *United States v. Aurich*, 31 MJ 95 (1990); *United States v. Ohrt*, *supra*; and *United States v. Horner*, *supra*. *See* Drafters' Analysis of RCM 1001(b)(5), Manual, *supra* at A21–68.

Because the defense did not object to any of the testimony covered in the granted issue, any error was waived, unless it rises to the level of plain error. *See United States v. Powell*, 49 MJ 460 (1998). We hold that there was no plain error.

■ Much of COL Newman's testimony dealt with the close emotional bond among soldiers who have served together in combat, and the fact that he was personally offended when he learned that appellant had fabricated his combat record. COL Newman did not mention rehabilitative potential. We hold that evidence of COL Newman's emotional reaction to appellant's misconduct was admissible under RCM 1001(b)(4).

■ However, COL Newman also testified that he had a poor opinion of appellant's character, that "it was something less than outstanding." This testimony runs afoul of RCM 1001(b)(5)(C), prohibiting opinion testimony based principally on the nature of the offenses.

■ Finally, COL Newman testified that he would not "want [appellant] around" in a combat jump. This comment could be construed as an indirect way of saying that COL Newman did not want appellant in his brigade. If so construed, it would contravene RCM 1001(b)(5)(D). Nevertheless, COL Newman's testimony was presented in the context of showing how appellant's misconduct had been personally offensive to other soldiers and was detrimental to the trust and confidence required among soldiers in combat. In this context, such testimony would be permissible under RCM 1001(b)(4). In any event, even if it was error to permit this comment by COL Newman, we are satisfied that it did not rise to the level of plain error.

■ MSG Falaniko's description of the dangers caused by appellant's misrepresentation of his qualifications and experience was admissible under RCM 1001(b)(4). Furthermore, unlike COL Newman and SFC Hutchinson, he had been appellant's first sergeant, supervised him, and knew him well enough to recommend him for assignment as a platoon leader. As such, he was qualified under RCM 1001(b)(5)(A) to express an opinion about appellant's potential for rehabilitation. Nevertheless, he limited his opinion to appellant's ability to lead troops. MSG Falaniko was not asked for and did not express an opinion about appellant's potential for rehabilitation. Thus, we hold that MSG Falaniko's testimony was permissible under RCM 1001(b)(4) and (5).

■ SFC Hutchinson's description of the special bond among soldiers who "jump onto an airfield while under fire," and his own emotional reaction to appellant's offenses was admissible under RCM 1001(b)(4). His testimony stopped short of suggesting that there was no place for appellant in the Army. His comment about appellant's ability to lead troops was a reflection on appellant's status as a *noncommissioned officer* rather than his suitability for continued military service.

■ SFC Hutchinson further testified that he would not want to serve in a unit with appellant. On its face, this testimony runs afoul of the spirit, if not the letter, of RCM 1001(b)(5)(D). Once again, however, this testimony was presented in the context of unit morale and discipline. SFC Hutchinson explained that "the Army is built on *integrity* and *trust*." Trial counsel referred to SFC Hutchinson's testimony only in terms of the emotional pain inflicted on him by appellant's misconduct. Such testimony is admissible under RCM 1001(b)(4). Thus, even if it was error, we are satisfied that the receipt of

SFC Hutchinson's testimony did not rise to the level of plain error.

The decision of the United States Army Court of Criminal Appeals is affirmed.

EFFRON, Judge (concurring in part and in the result):

I disagree with that portion of the majority opinion suggesting that the testimony of COL Newman and SFC Hutchinson was not objectionable. With respect to each, the testimony did not reflect that either possessed "sufficient information and knowledge about [appellant] to offer a rationally-based opinion that [would be] helpful to the sentencing authority," as required by RCM 1001(b)(5)(B). Neither of these witnesses had a personal relationship with the appellant. Neither provided sentencing testimony of a such a specialized nature that it would have been beyond the type of knowledge possessed by any court member selected to serve as "best qualified" by reason of training, experience, and the other factors set forth in Article 25, UCMJ, 10 USC § 825. The essence of the their testimony focused on the impact on themselves and others of the fact that appellant committed the charged offenses, which is the type of consideration that a court member qualified under Article 25 would bring to a sentencing deliberation.

I agree that this questioning did not constitute prejudicial plain error, particularly in view of defense counsel's questioning of these witnesses about their personal knowledge of appellant. In the absence of an objection, however, I do not agree that this case provides an appropriate vehicle for considering the type of testimony that may be provided on sentencing. Absent litigation about the nature of the information, its admissibility under RCM 1001, and its relationship to Article 25, the record before this Court does not permit appropriate consideration of the parameters of permissible sentencing testimony.