UNITED STATES, Appellee

v.

Michael W. CATRETT, Jr., Senior Airman
U.S. Air Force, Appellant

No. 01-0042

Crim. App. No. 33133

United States Court of Appeals for the Armed Forces

Argued April 25, 2001

Decided September 19, 2001

SULLIVAN, J., delivered the opinion of the Court, in which GIERKE
and EFFRON, JJ., joined.  CRAWFORD, C.J., filed an opinion
concurring in part and in the result.  BAKER, J., filed an
opinion concurring in part and in the result.

<u>Counsel</u>

For Appellant:  Major Natasha V. Wrobel, USAFR (argued); <u>Colonel James R.
Wise</u>, <u>Lieutenant Colonel Timothy W. Murphy</u>, and <u>Major Maria A. Fried</u> (on
brief).


For Appellee:  <u>Lieutenant Colonel Karen L. Manos</u>, USAFR (argued); <u>Colonel
Anthony P. Dattilo</u>, and <u>Major Lance B. Sigmon</u> (on brief); <u>Captain James
C. Fraser</u>.


Military Judge:  Amy M. Bechtold


<u>THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE PUBLICATION</u>.

Judge SULLIVAN delivered the opinion of the Court.

During late 1997, appellant was tried by a general court-martial composed of officer and enlisted members at Cannon Air Force Base, New Mexico. Contrary to his pleas, he was found guilty of aggravated assault and wrongfully damaging an automobile, in violation of Articles 128(b)(2) and 109, Uniform Code of Military Justice, 10 USC §§ 928(b)(2) and 909, respectively. On December 18, 1997, he was sentenced to a bad-conduct discharge, confinement for 11 months, forfeiture of $300.00 pay per month for 11 months, and reduction to airman basic. The convening authority approved this sentence, except for confinement exceeding 8 months, on March 2, 1998. The Court of Criminal Appeals affirmed the findings of guilty and the approved sentence on August 16, 2000.

On February 6, 2001, this Court granted review on the following issues:

> I. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT IN DENYING DEFENSE COUNSEL'S MOTION TO SUPPRESS STATEMENTS MADE BY APPELLANT AND EVIDENCE DERIVED FROM THOSE STATEMENTS.
>
> II. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT IN ALLOWING OPINION TESTIMONY IN REBUTTAL ON THE MERITS REGARDING APPELLANT'S MILITARY CHARACTER WITHOUT PROPER FOUNDATION.
>
> III. WHETHER THE STAFF JUDGE ADVOCATE ERRED IN FAILING TO RESPOND TO LEGAL ERRORS SUBMITTED BY THE DEFENSE TO THE STAFF JUDGE ADVOCATE RECOMMENDATION.

We resolve these issues in the Government's favor and affirm the decision of the Court of Criminal Appeals.

The Court of Criminal Appeals found the following facts pertinent to the above issues:

## I. Background

The appellant was deployed from Cannon Air Force Base (AFB), New Mexico, to Saudi Arabia from 6 May 1997 to 11 July 1997. During this deployment, the appellant asked his best friend, Airman First Class (A1C) Walker, to look after his wife. Within weeks, A1C Walker and Mrs. Catrett began a sexual affair. The relationship continued until shortly before the appellant returned home. On 25 July 1997, the appellant, his wife, and A1C Walker were at the appellant's house in Clovis, NM. Mrs. Catrett proceeded to tell the appellant that she was unhappy and was leaving him. The appellant became upset and asked if she wanted to leave him because of A1C Walker. An argument then ensued between the appellant and A1C Walker. Shortly thereafter, the appellant struck A1C Walker in the back of the head with an object, knocking him onto a couch, and began striking him on his head and body with a rawhide dog bone, a brass sailfish statue, and his fists. The appellant also bit A1C Walker on his head and body and gouged A1C Walker's eyes with his fingers. At this point, the appellant's mother, who lived with the appellant, stopped the fight; however, the appellant indicated he intended to "finish this tonight." A1C Walker, fearing that the appellant might attack him again, fled the house. Within seconds of A1C Walker's departure, Mrs. Catrett fled the house and accompanied A1C Walker to the nearby residence of SSgt [Staff Sergeant] R.

* * *

### A. Statements by the Wife

After leaving the appellant's house, A1C Walker and Mrs. Catrett ran to SSgt R's apartment. Once inside, A1C Walker phoned the Clovis Police Department and reported that he had been assaulted. Upon the arrival of the police, A1C Walker

explained to the police what had happened. During this discussion, Mrs. Catrett was about 5 to 7 feet away from A1C Walker and the police. Shortly after the police arrived, paramedics came to the apartment, examined A1C Walker, and took him to the local hospital. Just before A1C Walker left for the hospital, Mrs. Catrett told one of the responding police officers, Officer S, that after she told the appellant she did not want to be with him anymore, the appellant got a gun and hit A1C Walker with it. Both SSgt R and Officer S testified that while at the apartment, Mrs. Catrett was excited, frantic, and appeared afraid. She repeatedly asked what was she going to do. Thereafter, Mrs. Catrett left SSgt R's apartment with Officer S in a police vehicle and went to the appellant's residence.

Upon arrival at the residence, while still in the police vehicle, Mrs. Catrett told Officer S that she was not having an affair with A1C Walker, that she still loved her husband, and had been with him since she was 13 years old. While in the car, Mrs. Catrett was still afraid and continued to be concerned with the consequences of what had happened. After this brief conversation, Officer S took Mrs. Catrett to the police station to obtain a written statement from her. Prior to taking her statement, Officer S informed her that she would have to sign the statement under oath, and that it would be used as evidence of what happened that night. At this point, Mrs. Catrett said she could not write, was scared, shaking and could not hold a pen. Officer S told her he would write the statement for her if she would relate to him what happened. She stated that after getting back from the party, she told her husband she was going to leave him. The appellant became furious, ran to their bedroom, and returned with a gun. After the appellant pushed her out of the way, the appellant and A1C Walker began to fight. She ran in and out of the room a number of times. At one point, she saw the appellant hit A1C Walker with a rawhide dog bone. After a few minutes the fight stopped, and she saw

4

that A1C Walker was bleeding.  The
appellant then stated he was going to get
another gun and this is when she and A1C
Walker ran from the house.  After giving
this statement to Officer S, Mrs. Catrett
was crying and was concerned about where
she would go.  After writing the
statement, Officer S took Mrs. Catrett to
Detective S in order to have him notarize
the statement.  When Detective S met with
Mrs. Catrett, she was still emotionally
upset.  She was crying and nervous.  At
this time, Detective S felt that Mrs.
Catrett was too upset to sign her
statement in front of a notary and decided
to let her leave the police station.  She
returned later that morning and stated
that she did not want to sign the
statement.  She told Detective S that she
had nowhere to go, no one to be with, and
did not want to get her husband into any
other trouble because she could only live
in Clovis with him.

During the period 24 September 1997 to 3
December 1997, Mrs. Catrett provided one
oral statement and one written, sworn
statement to the appellant's defense team
in which she stated that her statements to
the local police authorities were false
and denied the allegations against her
husband.  Additionally, in between her
statements to the defense, she provided a
written, sworn statement to the Cannon Air
Force Base Office of Special
Investigations (AFOSI) in which she
reaffirmed the statements she made to the
local police authorities on 25 July 1997.
Finally, at trial, Mrs. Catrett asserted
her privilege not to testify against her
husband.

\*   \*   \*

B.  The Appellant's Admissions to Civilian
Police

After talking with A1C Walker at SSgt
R's apartment, three police officers went
to the appellant's residence.  At the time
the police entered the appellant's
residence, they were aware of the
allegation that the appellant had
assaulted A1C Walker with a handgun and

5

considered him a suspect. Upon entering the residence, Officer M patted the appellant down and found a knife. Further, Officer M saw blood on the walls, floor, and couch and noticed that the appellant exhibited no injuries. Officer M informed the appellant they were responding to an assault complaint and asked the appellant what happened. The appellant informed the police that his wife had had an affair with A1C Walker. At this point the appellant began to get agitated and was advised to remain calm. The appellant was then informed that a handgun was allegedly used in the assault. After denying that a gun was used, the appellant consented to a search of his residence.

At one point during the search, the appellant, accompanied by Officer L, went to the kitchen to get a Popsicle. The appellant was then told that he needed to either remain in the living room or have an officer accompany him if he left the room. Thereafter, Officer A remained with the appellant in the living room. Additionally, while the search was still on-going, the appellant talked with his mother, who resided with him, and talked with his father on the telephone. At no time did the police attempt to interfere with these conversations.

During the search, Officer M found a gun holster but no handgun. After finding the gun holster, Officer M went back to the living room and again asked the appellant what happened. At this point, Officer M noticed a rawhide dog bone on the floor with blood on it. He asked the appellant if he had hit A1C Walker with the bone. The appellant responded that he had. Officer M then reiterated to the appellant that "apparently a gun was involved." The appellant responded that there was no gun, that he hit A1C Walker with the dog bone, and that he had also hit A1C Walker with a brass sailfish statue, which was located on a stereo. The dog bone and sailfish were later seized by Detective S who arrested the appellant and took him to the police station where, for the first time, he was read his Miranda warnings. The

> appellant declined to make a statement and requested a lawyer.
>
> While at his residence, the appellant was never told he was under arrest nor was he handcuffed. Although the appellant was never told he could not leave the premises, Officer M testified that the appellant was not free to leave the premises and would have been stopped if he tried. Officer M stated that while the appellant was detained, he was not in custody. Officer M explained that an individual who was detained, although not free to leave, was not handcuffed. However, a person in custody, although not free to leave, was handcuffed. Officer M's intent in detaining the appellant was to secure the crime scene, secure any weapons for the officers' safety, and to ask preliminary questions to get an idea of what happened. Officer M stated that the decision to place the appellant in custody was to be made by Detective S.

Unpub. op. at 2-6 (emphasis added).

I

The first question before us is whether the trial judge erred in denying the defense motion to suppress appellant's statements to civilian police and any evidence derived therefrom. See Miranda v. Arizona, 384 U.S. 436 (1966). Appellant contends that the judge erred in concluding that he was not in custody when questioned by civilian police in his apartment. He further argues that the Court of Criminal Appeals erred when it found that his in-custody questioning was justified under the "public safety" exception to Miranda recognized in New York v. Quarles, 467 U.S. 649, 655 (1984). Finally, he broadly asserts that the recent decision of the Supreme Court in Dickerson v. United States, 530 U.S. 428 (2000), invalidated the "public safety" exception to Miranda.

Initially, we note our agreement with the Court of Criminal Appeals (CCA) that appellant was in custody when questioned by civilian police in his apartment on July 25, 1997.  It said:

> After reviewing the evidence, we disagree with the military judge and conclude the appellant was in custody once the police told him he was not free to leave the living room unless a police officer accompanied him.  After receiving this instruction the appellant never left the living room until he was taken to the police station.  While the appellant was in the living room, there was always a police officer present to control his movements.  Therefore, from that time on, the appellant was under constant police supervision.  According to Officer M's testimony, the appellant was under detention, was not free to leave, and would have been stopped if he attempted to do so.
>
> Based upon these factors, we find that a reasonable person, finding themselves in like circumstances, would conclude they were not free to leave the control of the police.  In this regard, we find the facts present in this case are not unlike those found in Orozco v. Texas, 394 U.S. 324 (1969).

Unpub. op. at 7.  This is a de novo question of law to be decided on the basis of facts found by the factfinder (the CCA) (see Thompson v. Keohane, 516 U.S. 99, 112-13 (1995)).  We likewise conclude that Orozco v. Texas, supra, is persuasive authority. See New York v. Quarles, 467 U.S. at 659 n.8.

Our next concern is whether appellant's questioning in custody without the required Miranda warning was nonetheless justified by "the public safety exception" to Miranda recognized in New York v. Quarles, supra at 655.  See also United States v.

United States v. Catrett, 01-0042/AF

Loukas, 29 MJ 385, 389 (CMA 1990). The Court of Criminal Appeals held that Quarles was applicable in this case:

> Although we find the appellant was in custody, his Miranda rights were not violated. Prior to arriving at the appellant's residence, Officer M was informed that a gun was used in the assault. Upon entering the residence, he was concerned with locating the gun because of officer safety concerns. This was evident by his telling the appellant to keep his hands where he could see them and by his search of the appellant's person and seizure of the knife. His latter [sic] discovery of the empty gun holster only added to his concerns about a gun. His questioning of the appellant was directly attributable to his desire to locate the gun and secure it. It was while asking the appellant further questions about the gun that Officer M noticed the rawhide dog bone with blood on it in plain view. Officer M asked the appellant if he hit A1C Walker with the bone. When the appellant replied that he had, Officer M, still worried about the gun, specifically said to the appellant, "Apparently a gun was involved." The appellant then reiterated that no gun was involved because he hit A1C Walker with the dog bone and the brass sailfish. These admissions were directly related to Officer M's attempts to locate the gun because of his concern for the safety of the police officers at the appellant's residence. Accordingly, the public safety exemption [sic] to the Miranda warnings as announced by the Supreme Court in Quarles is applicable to this case and the appellant's admissions; the rawhide dog bone and the brass sailfish were properly admitted into evidence.

Unpub. op. at 8-9 (emphasis added).

Appellant disagrees and asserts: "Officer [M] interrogated the Appellant not to secure the safety of any police officer or

the public but simply to obtain a confession." Final Brief at 14.

The Supreme Court in New York v. Quarles, 467 U.S. at 657-58, recognized a narrow exception to the Miranda-warnings' requirement with respect to questioning a suspect in custody. It said:

> The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.
>
> In such a situation, if the police are required to recite the familiar Miranda warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in Miranda in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the Miranda majority was willing to bear that cost. Here, had Miranda warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

> We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

(Emphasis added.)

In appellant's case the civilian police were responding to a domestic-assault complaint in which a gun was reportedly involved. See United States v. Simpson, 974 F.2d 845, 847 (7th Cir. 1992), cert. denied, 507 U.S. 936 (1993). Although appellant denied using a gun, an empty holster was also found during a search of appellant's apartment before the challenged questioning. See New York v. Quarles, supra at 657. Finally, the questions asked by the police, although phrased in terms of the cause of the reported assault, were found by the judge to be legitimate attempts by police to locate the still-missing gun. (R. 138) Compare United States v. Williams, 181 F.3d 945, 953 (8th Cir. 1999), with Quarles, supra at 659 n.8. We agree with the appellate court below that the public-safety exception to Miranda applied in these circumstances. See generally United States v. Loukas, 29 MJ at 389.

United States v. Catrett, 01-0042/AF

Our final inquiry on this granted issue is whether the recent decision of the Supreme Court in Dickerson v. United States, 530 U.S. 428 (2000), undermined the public-safety exception to Miranda as contended by Judge Young at the service court below. Unpub. op. at 11.  The basic argument is that, although exceptions to the court-made exclusionary rule may be carved out by the Supreme Court, exceptions to a constitutionally based rule against coerced confessions may not.  See 530 U.S. at 452-53 (Scalia, J., dissenting).  Chief Justice Rehnquist, writing for the majority in Dickerson v. United States, supra at 441, rejected this argument ("no constitutional rule is immutable") and so do we.

Regardless of the impact, if any, of Dickerson upon Quarles, we still would find any Miranda violation in this case harmless beyond a reasonable doubt.  See Arizona v. Fulminante, 499 U.S. 279, 295 (1991).  In response to the challenged questioning by civilian police, appellant admitted to civilian police that he hit A1C Walker with a dog bone and a sailfish statue.  However, the alleged victim testified in this case that appellant so assaulted him.  Moreover, evidence of statements made by appellant's wife, an eyewitness, to the same effect were admitted in this case.  Finally, the bloodied dog bone, which was admitted as evidence in this case, was discovered in plain view in appellant's apartment before he made the challenged incriminating admissions.

United States v. Catrett, 01-0042/AF

II

The second question presented in this appeal is whether the military judge erred in allowing a civilian landlord to testify to appellant's poor military character.  See generally Mil. R. Evid. 404(a)(1), Manual for Courts-Martial, United States, 1984. Previously, the defense had called two senior enlisted military members during its case-in-chief to testify to appellant's good military character. (R. 367-72; 377-80)  The defense offered this evidence to support its contention that appellant did not commit the charged offenses.  See United States v. Piatt, 17 MJ 442, 445-46 (CMA 1984).  The Government offered the challenged testimony of the landlord to rebut the defense evidence of good military character, and the defense objected based on this witness' qualifications to provide such testimony. (R. 385)

Mil. R. Evid. 405(a) provides:

> **Rule 405.  Methods of proving character**
>
> (a)  Reputation or opinion.  In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion.  On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(Emphasis added.)

In United States v. Toro, 37 MJ 313, 317 (1993), cert. denied, 510 U.S. 1091 (1994), this Court commented on the foundation required before such opinion evidence is admitted at a court-martial:

13

> To lay a proper foundation for opinion evidence, the proponent must show that the character witness personally knows the witness and is acquainted with the witness well enough to have had an opportunity to form an opinion of the witness' character for truthfulness. In United States v. Perner, 14 MJ 181, 184-85 (CMA 1982), this Court held that an enlisted psychiatric technician who "had seen" the accused's "wife professionally" on three occasions did not enjoy a sufficiently close relationship to express an opinion as to untruthfulness.

Appellant argues that Mr. Graham, appellant's civilian landlord, was not qualified to offer an opinion on his military character. (R. 385-87) See also United States v. Jenkins, 27 MJ 209 (CMA 1988).

The military judge is charged with deciding whether a party has established a sufficient foundation for admission of opinion evidence concerning a person's character. See generally Mil. R. Evid. 104(a). She has considerable discretion in this regard. See United States v. Breeding, 44 MJ 345, 351 (1996) (and cases cited therein). For several reasons, we conclude that the military judge did not abuse this discretion in permitting Mr. Graham, a civilian, to testify about appellant's military character. Cf. id. at 348-51.

The record in this case shows that Mr. Graham was a civilian who had not previously served in the military. (R. 403) However, it also shows that his father had been in the military, and he grew up on the "civil service side" of the military community.

14

(R. 405)  Moreover, Mr. Graham did have regular contact with the military and its personnel in various capacities.  He testified:

> Q:  And do you belong to any organizations in Clovis?
>
> A:  Several.  I belong to the Chamber of Commerce.  I belong to the Air Force Armed Services Committee.  I belong to a church organization, Rotary, and Lions Club.
>
> Q:  Professionally, what kind of interaction do you have with Cannon Air Force Base?
>
> A:  Professionally, of course, involved with the chamber.  We do a lot of events that involve -- community service type events that involve the community.  I participate in a lot of the events that involve change of command.  Of course, we attend those.  Some of the social functions out here.  I have a very strong involvement with the Cannon Air Force Base housing office, with us leasing to virtually hundreds of tenants every year.  We deal with them on a daily basis.  We have dealt with -- I have been on some strategic planning committees that involve the base commander and wing commander in reference to housing needs in the Clovis market during the years of Cannon's expansion and reorganization.  So I've served on a lot of those committees.  Basically -- a lot of involvement, of course, with the legal office, helping people review their leases and go over information, and things like that over the years.
>
> Q:  Okay, sir.  And about how many rental units do you think you have?
>
> A:  We have 583 units currently.
>
> Q:  And your best guess, about how much -- what percentage are rented to military personnel?
>
> A:  Typically, our makeup is somewhere around 300 to 200 nonmilitary.  So usually

> around 300 active military are in our
> units at all times.  Over the last 10
> years, we've rented to over 10,000 people
> and, in that group, probably about 7 to
> 8,000 have been military.  So I've had a
> lot of contact over the years with the
> military.

(R. 401-02)  In our view, the military judge had some basis for her ruling and she did not abuse her discretion in admitting military-character testimony from this witness.  Cf. United States v. Armon, 51 MJ 83, 87 (1999)(military-character testimony of officer who did not know accused or his service record inadmissible).

### III

The third question in this case is whether the staff judge advocate prejudicially erred by failing to respond to appellant's post-trial claims of legal error at his court-martial.  Appellant submitted a nine-page response to the staff judge advocate's recommendation delineating in great detail four legal errors.  These alleged errors are summarized by him as follows:

> First, whether the evidence presented at
> trial was sufficient to support the
> conviction of aggravated assault; second,
> whether the trial judge improperly
> admitted the hearsay statements of the
> Appellant's wife; third, failure of the
> local police to advise the Appellant of
> his Miranda rights prior to questioning
> him; and fourth, whether the military
> judge improperly allowed the court members
> to hear opinion evidence.

Final Brief at 23.

16

Appellant contends that the staff judge advocate in his addendum failed to respond or even mention any of these errors.

RCM 1106(d)(4), Manual, supra, states in pertinent part:

> (4) <u>Legal errors</u>. The staff judge advocate or legal officer is not required to examine the record for legal errors. However, when the recommendation is prepared by a staff judge advocate, the <u>staff judge advocate shall state whether, in the staff judge advocate's opinion, corrective action on the findings or sentence should be taken when an allegation of legal error is raised in</u> matters submitted under RCM 1105 or when otherwise deemed appropriate by the staff judge advocate. <u>The response may consist of a statement of agreement or disagreement with the matter raised by the accused. An analysis or rationale for the staff judge advocate's statement, if any, concerning legal errors is not required</u>.

(Emphasis added.) Here, paragraph 2 of the Addendum to the Staff Judge Advocate Recommendation stated:

> 2. The matters submitted by the defense are attached to this Addendum and are hereby incorporated by reference. <u>Nothing contained in the defense submissions warrants further modification of the opinions and recommendations expressed in the Staff Judge Advocate's Recommendations</u>. Of course, you must consider all written matters submitted before you determine the appropriate action to be taken in this case.

(Emphasis added.) In our view, this statement satisfied the minimal-response requirement of RCM 1106(d)(4).

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

United States v. Catrett, Jr., No.01-0042/AF

CRAWFORD, Chief Judge (concurring in part and in the result):

I agree with the majority's discussion of Issues II and III. However, as to Issue I, I agree with the military judge that a "[p]oliceman's ... uncommunicated decision to arrest ... does not bear on whether the suspect is in custody." Based on the facts and this conclusion of law, she correctly held that appellant was not in custody.

FACTS

After returning home from a 2 months' deployment, appellant became convinced that his best friend, A1C Walker, had began a sexual relationship with appellant's wife. In Walker's presence, appellant's wife said she wanted to leave him. Appellant than "struck A1C Walker on the back of the head with an object, knocking him onto a couch," and "gouged A1C Walker's eyes with his fingers." Then "appellant's mother, who lived with the appellant, stopped the fight;" but "appellant indicated he intended to 'finish this tonight.'" Walker, fearing for his life, and appellant's wife, "fled the house" and went "to the nearby residence of SSgt R. Unpub. op. at 2.

After leaving the house, Walker phoned the Clovis, New Mexico, Police Department and reported the assault. A bit after the police arrived at SSgt R's residence, appellant's wife told the police that her husband had used a gun to hit Walker. Both SSgt R and the police officer "testified that while at the apartment," appellant's wife "was excited, frantic, and appeared

afraid." She was taken back to her home. Arriving at her home, appellant's wife told the police officer "that she was not having an affair"; still loved her husband, and had been with him" for many years. Unpub. op. at 3.

Later, the officers informed appellant that they were investigating the alleged assault. At the time they noticed "blood on the walls, floor, and couch," but observed that "appellant exhibited no injuries." Appellant became agitated when he was telling the police about his wife's affair with Walker. When appellant was informed that a weapon had been used in the assault, he denied using a gun. After this denial, he "consented to a search of his residence." While the search was ongoing, appellant went to the kitchen to get a popsicle; he then returned to the living room and talked to his mother who lived with him. He also talked to his father on the telephone. Later, a police officer found a holster but no gun, and asked appellant what had happened. At the same time the officer noticed a bloodstained rawhide dog bone on the floor. He asked appellant if the dog bone was used to hit Walker. Appellant responded that he had used it. The officer again questioned appellant about a gun but appellant repeated his denial of using a gun, saying he only used the dog bone and a sailfish statue. After seizure of the dog bone and the sailfish statue, appellant was arrested and warned of his rights. He asked for counsel. Unpub. op. at 5-6.

According to the court below:

> While at his residence, the appellant was never told he was under arrest nor was he handcuffed.  Although the appellant was never told he could not leave the premises, Officer M testified that the appellant was not free to leave the premises and would have been stopped if he tried.  Officer M stated that while the appellant was detained, he was not in custody.

Unpub. op. at 6.

## DISCUSSION

The judge's decision on the suppression motion is reviewed for an abuse of discretion.  United States v. Young, 49 MJ 265, 266-67 (1998); United States v. Schelkle, 47 MJ 110, 112 (1997), cert. denied, 522 U.S. 1078 (1998).  A judge's findings of fact are accepted unless clearly erroneous.  See, e.g., United States v. Bins, 43 MJ 79, 83 (1995); United States v. Wallace, 39 MJ 284, 286 (CMA 1994).  However, the question of custody is "a 'mixed question of law and fact' qualifying for independent review."  Thompson v. Keohane, 516 U.S. 99, 113 (1995).

In United States v. Miller, 45 MJ 149 (1996), this Court, relying on Stansbury v. California, 511 U.S. 318 (1994), adopted an objective test rather than a subjective test to determine whether a person is in custody.  See also United States v. Meeks, 41 MJ 150, 161 n.3 (CMA 1994).  Thus, the subjective intent of the officer as to what might happen if appellant tried to leave is not taken into consideration in determining whether custody existed, unless this intent is communicated to appellant.  Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  See also Stansbury, 511 U.S. at 319.  Where the intent to make a seizure

3

has not been communicated to the suspect, a number of federal courts have held that an interrogation in a suspect's home is non-custodial.  See, e.g., United States v. Rith, 164 F.3d 1323, 1332 (10th Cir.), cert. denied, 528 U.S. 827 (1999), United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992); United States v. Lanni, 951 F.2d 440, 442-43 (1st Cir. 1991).

In Dickerson v. United States, 530 U.S. 428, 431-32 (2000), the Court stated that Miranda v. Arizona, 384 U.S. 436 (1966), "held that certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence."  Because Miranda is a rule of "constitutional" dimension, the Court held that Congress does not have the right to overrule it.  The Court reiterated that the reason for Miranda was the difficulty of sorting out what constitutes a voluntary confession.  530 U.S. at 435.  It is particularly difficult to determine voluntariness when an interrogation takes place in the isolation of the police station where there are no witnesses other than the suspect and police officers.  Id. at 435.  The Court emphasized in Miranda that in a custodial interrogation, the suspect "was cut off from the outside world," and placed in a "police-dominated atmosphere."  Miranda, 384 U.S. at 445.  Generally, interrogations involving deceit and trickery can occur in the secrecy of the police station.  As has been said:

> Custodial arrest is said to convey to the suspect
> a message that he has no choice but to submit to
> the officers' will and to confess....  [C]ustodial
> arrest thrusts an individual into ... "an

4

> interrogation environment ... created for no
> purpose other than to subjugate the individual
> to the will of the examiner." Many of the
> psychological ploys discussed in Miranda
> capitalize on the suspect's unfamiliarity with the
> officers and the environment.... Finally,
> the coercion inherent in custodial interrogation
> derives in large measure from an interrogator's
> insinuations that the interrogation will continue
> until a confession is obtained.

Minnesota v. Murphy, 465 U.S. 420, 433 (1984)(citation omitted).

The Supreme Court has addressed custodial interrogations outside the stationhouse in two cases. Beckwith v. United States, 425 U.S. 341 (1976), and Orozco v. Texas, 394 U.S. 324 (1969). Cf. Minnesota v. Murphy, supra.

In Beckwith, two special agents from the IRS went to the defendant's private residence at 8:00 a.m. Upon arrival they identified themselves as IRS agents and asked to speak to Beckwith. They were invited into the house and asked to wait while Beckwith finished dressing. Then Beckwith came out and sat down at the dining room table with the agents. They informed Beckwith that they were investigating a possible criminal tax fraud. Without giving a complete Miranda warning, they did advise him that under the Fifth Amendment to the Constitution of the United States, you cannot be compelled to answer any questions. Beckwith acknowledged that he understood his rights and was interviewed by the agents for nearly 3 hours. The conversation was described as friendly and relaxed and Beckwith was not pressed. At the conclusion of the interview the senior

agent received permission from Beckwith to inspect certain records.  The Court held that this interrogation did not constitute a custodial interrogation.  Likewise, in Murphy, the Court held that an interrogation at the defendant's office was not a custodial interrogation.  465 U.S. at 429-30.

This is not a case that takes place at the police station or where four officers are permitted to enter the defendant's boardinghouse room at 4:00 a.m. "by an unidentified woman." Orozco, supra at 325.  The Court noted that while "petitioner was interrogated on his own bed, in familiar surroundings," id. at 326, Orozco was "under arrest and not free to leave."  Id. at 327.  The dissenters in Orozco stated:  "Even accepting Miranda, the Court extends the rule here and draws the straitjacket even tighter."  Id. at 328 (White and Stewart, JJ., dissenting).

In this case, there was no "'formal arrest or restraint on freedom of movement'... associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983).  This interrogation took place on appellant's "own turf."  United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985).  The Miranda decision was aimed at alleviating the subtle and not so subtle pressures that take place at a stationhouse interrogation or where an individual is placed in unfamiliar surroundings removed from family members and friends.  Appellant was free to talk on the telephone, to go to the kitchen to get a popsicle, was not handcuffed, and was not ordered to remain in a specific

location.  While appellant "at some point" was asked in effect not to interfere with the search or investigation, this is reasonable police conduct constituting no more than a temporary detention and did not result in a formal arrest or custody at that time.  Cf. Illinois v. McArthur, 121 S. Ct. 946 (2001).  In fact, when the police arrived at the house, they did not use their lights or sirens and did not use any of the subtle coercions mentioned in Miranda.  Nor is this an instance like Helmel where the police "answered all incoming telephone calls." Even so the court in Helmel held that there was no custodial interrogation.  See, e.g., 769 F.2d at 1320.  The police did not threaten Catrett with criminal charges or imprisonment, or subject him to a prolonged interrogation.  See, e.g., Lanni, 951 F.2d at 441-43 (interview in defendant's home around 8 a.m. just after she had awakened, gotten dressed, and opened the door not custodial interrogation).  Thus, Catrett was not in custody and no rights' warnings were required.

For these reasons only I agree with the majority's disposition of Issue I.

United States v. Catrett, No. 01-0042/AF

BAKER, Judge (concurring in part and in the result):

I agree with the majority on Issues II and III. On Issue I, the majority concludes that appellant was in custody. I agree. The court below found: "At one point during the search, the appellant. . . was then told that he needed to either remain in the living room or have an officer accompany him if he left the room. Thereafter, Officer A remained with the appellant in the living room." Unpub. op at 5 (emphasis added). At this point, appellant was no longer free to leave and was in custody. Orozco v. Texas, 394 U.S. 324, 327 (1969). Police questioning of appellant occurred before and after appellant was taken into custody. It was after he was taken into custody that appellant told the police that he had hit the victim with a dog bone and the sailfish statue.

In this case, there is a tension between the conclusion that appellant was in custody and application of the public-safety exception, where that exception is alone premised on the safety of the police officers exercising custody over appellant. As a result, for the reasons stated below, I vote to affirm this case on the basis that if there were error below, it was harmless beyond a reasonable doubt.

1

Under the public-safety exception to *Miranda*, a custodial statement obtained in the absence of *Miranda* warnings need not be suppressed if police obtain the statement in light of an objectively reasonable need to protect either the police or the public from immediate danger. New York v. Quarles, 467 U.S. 649, 659 n. 8 (1984); United States v. Jones, 26 MJ 353, 356 (CMA 1988). This narrow *Miranda* exception is limited to questions necessary to secure the safety of police officers and the safety of the public. Once such information has been obtained, the suspect must be given the *Miranda* warnings, before custodial interrogation continues. Significantly, while recognizing that the public-safety exception ran against the Court's interest in preserving *Miranda* "clarity," the Court intended that the exception be "workable" and not require officers faced with the immediacy of events to engage in precise on-scene balancing between permitted and prohibited questions. Quarles, supra at 658.

In determining whether there is an objectively reasonable basis to invoke the exception, courts have looked to the totality of the circumstances presented,

including:  the imminence of danger from weapons[1]; the
possible presence of bystanders who could be harmed by
weapons[2]; the possible presence of additional individuals
who could use weapons[3]; and a suspect's freedom of movement
and potential access to weapons.[4]

In this case there came a time when appellant was
under police custody and his mobility controlled.  The home
had been searched and no additional individuals were
located or identified who might present a threat to the
officers or to the public at large.  The public did not
have access to the home.  The empty holster was cause for
concern, but absent appellant, the record does not indicate
the presence of any other individuals who might threaten
the officers.  If the officers felt that the presence of

---

[1] State v. Finch, 975 P.2d 967, 990-91 (Wash.)(exception applicable
during telephone negotiations by SWAT team with defendant barricaded in
home where *Miranda* warnings could further upset defendant and erode
potential for peaceful resolution), cert. denied, 528 U.S. 922 (1999).
See United States v. Moses, 45 MJ 132, 134 and n. 3 (1996).
[2] Trice v. United States, 662 A.2d 891, 896 (D.C. 1995)(exception applies
in light of "strong circumstantial evidence" of gun at defendant's
residence and presence of small children in home at time of arrest,
notwithstanding that arrest and questioning occurred 4 days after
shooting and detective waited 1 hour after arrest to ask question at
police station).
[3] People v. R. Simpson, 76 Cal.Rptr.2d 851, 853 (Cal.App. 4 Dist.
1998)(objectively reasonable. . . to question the suspect about the
presence of weapons and other potential dangers in execution of search
warrant "upon premises" of "known drug trafficker,. . . probable cause
to believe substantial quantities of illegal drugs will be found," and
"not knowing who else might be present on the property").
[4] United States v. DeSantis, 870 F.2d 536, 541 (9th Cir. 1989)(even if
right to counsel was invoked       when police came into the house,
exception allowed questioning about whether there were weapons in

3

appellant's mother created risk, they did not act that way. Nor is this a case where the police asked the offending question before searching the home. Based on the totality of these circumstances, it is not clear that a reasonably objective need existed to protect the officers or the public once appellant was in custody.

Nonetheless, if there were error in admitting appellant's statements about the dog bone and the sailfish statue, after he was in custody, such error was harmless beyond a reasonable doubt. Appellant's statements could not have substantially influenced the findings in light of the other evidence against appellant. This evidence included: (1) the victim's testimony; (2) the wife's statement; and (3) the bloody dog bone, which was found in plain view and, at the very least, would inevitably have been discovered.

---

adjoining bedroom when defendant asked to go in there to change clothes).